**AMERICAN LINE BUILDERS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 290–87C.**

United States Claims Court.

Sept. 14, 1992.

Stephen L. Nourse, Seattle, Wash., attorney of record, for plaintiff.

Sheryl L. Floyd, U.S. Dept. of Justice, Civ. Div., Washington, D.C., attorney of record, for defendant, with whom were the Asst. Atty. Gen. and Scott W. Singer, Office of General Counsel, Western Area Power Admin., Golden, Colo.

## OPINION

HORN, Judge.

Plaintiff, American Line Builders, Inc. (ALB), filed its "Complaint for Additional Compensation," pursuant to sections 601–613 of Title 41 of the United States Code, 41 U.S.C. §§ 601–613 (1988), alleging that the defendant, the United States, through its agent, the Department of Energy, Western Area Power Administration (WAPA), directed the plaintiff to perform work in addition to that specified in the contract between the plaintiff and WAPA, by amending and delaying the contract work schedules and requirements. Plaintiff, ALB, seeks compensation for the additional material costs and other additional costs allegedly caused by the work delays.

Prior to filing the complaint in this court, by letter, dated November 25, 1985, ALB submitted its claim for additional compensation to WAPA's contracting officer requesting $643,198.00 for costs incurred as a result of: (1) changes in structure heights included in Change Order A001; (2) changes associated with a number of the cultural sites; (3) delays in right of way and access road releases; and (4) structure changes/moves directed by WAPA after the issuance of Change Order A001. Then, by letter, dated December 4, 1986, plaintiff submitted a revised claim of $1,768,089.20, and a request for a time extension of 200 days. The December 4, 1986, letter included the claims submitted by ALB in the November 25, 1985 letter, and added additional claims for: change of pins to bolts;

supply guy wire spacers; stringing, clipping and deadending; Davis–Bacon Act classification changes; removal operations; re-mobilization costs; extended overhead; and, tightening hardware and plumbing of structures.

On April 23, 1987, WAPA transmitted to ALB the contracting officer's decision on ALB's December, 1986 claim. In his decision, the WAPA contracting officer allowed a total equitable adjustment of $23,411.00 for certain claims related to Change Order A001, the cultural resource sites, certain parcel right-of-ways, and to structure changes/moves. The contracting officer denied ALB's claims for tightening hardware, plumbing structures, removal operations, Davis–Bacon Act classification changes, supply guy wire spacers, and change out pins for bolts.

In its complaint filed in this court, ALB claims it is due additional compensation for: (1) changes in structure heights included in Change Order A001; (2) changes in cultural resource sites; (3) changes in right-of-way releases; (4) restriction to obtaining access; (5) moving structures; (6) change out pins for bolts; (7) supplying guy wires; (8) stringing, clipping and deadending; (9) changes in Davis–Bacon Act classifications; (10) delays in removal operations; (11) additional re-mobilization costs; (12) extended overhead costs; and (13) tightening hardware and plumbing of structures.

A ten day trial was held, after which, each party submitted extensive post-trial briefs, along with responses, replies and supplements thereto. After careful consideration of the facts and arguments presented by the parties, both at trial and in their written submissions, this court finds, as is more fully discussed below, that the plaintiff is entitled to partial recovery on its claim.

## BACKGROUND

*Overview*

On January 16, 1984, ALB and WAPA entered into a fixed price contract, DE–AC65–84WP15857 (hereinafter the WAPA contract) for the removal of an existing 161 kV wood-pole, H–Frame transmission line in its entirety, approximately 188 miles in length. Additionally, the contract required the plaintiff to furnish all materials and construct a new single circuit, 3–phase, wood-pole, H-frame, 230 kV transmission line, approximately 180 miles in length. The original contract price was $11,708,300.00.[1] According to the terms of the WAPA contract, the construction of the new transmission line was to be completed by December 1, 1985, and the removal of the old transmission line was to be completed by April 1, 1986.

The transmission line is located between Fort Peck and Havre, Montana, along geologically undulating plains and farmland. The Fort Peck Substation, located at Fort Peck Dam, Montana, is at the eastern end of the transmission line and is designated for the purposes of the contract and for this Opinion as point O/1.[2] Moving west, the Richardson–Coulee Substation is next in line at structure 28/5. The Malta Substation follows, and is located in the middle end of the transmission line at structure 80/1. The Malta Substation is followed by the Harlem Substation at structure 127/7, and the Chinook Substation at structure 154/5. The end of the transmission line is at Havre, Montana, at structure 178/7.

In accordance with the bid solicitation, the successful bidder was to purchase and supply all materials for the project, with the exception of gate closures. To meet the WAPA contract requirements, ALB entered into contractual arrangements with various subcontractors. ALB subcontracted the work for surveying and clearing

---

1. Pursuant to Change Order A013, issued following the contracting officer's April 23, 1987 decision, the contract price was modified to reflect that decision by adding $23,411.00 to the contract price, so that the total contract price became $11,809,337.10.

2. Structure O/1 is the first structure at mile 0 of the transmission line. Correspondingly, structure 178/7 is the seventh and last structure in the 178th mile of the transmission line sequence, and is located at Havre, Montana. In other words, the first number in the sequence is

gates.[3] ALB also subcontracted with Hughes Brothers to supply the pole top assemblies and cross-arms. The supplier of the conductor was Kaiser Aluminum & Chemical Corporation. Indiana Steel & Wire supplied the guy wire and overhead ground wires. A.B. Chance Co. supplied the anchor materials to Montana Electric Supply Co., from which ALB purchased the materials. ALB purchased ground wire from Copperweld Bimetallics Group. Hamby–Young supplied most of the insulators. Additional pole insulators were supplied by Lapp, Insulation Division.

On February 10, 1984, ALB contracted with the John C. Taylor Lumber Co. (Taylor Lumber) to supply, treat and deliver to holding areas, and to points along the project route, all wood poles required to be furnished under the WAPA contract. Taylor Lumber, in turn, employed Steve Stark to sort and deliver poles from the holding areas and points of delivery along the transmission line construction route to specific structure sites along the transmission line. Bode Inspection, Inc., under contract to ALB, inspected the poles supplied to ALB by Taylor Lumber Co.

The project schedule was provided for in paragraphs 1.1.3 and 1.1.4.a., Construction Program, General Requirements, of the Contract Specifications No. WC–4–15857–116. The relevant portion of section 1.1.3, "COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK," is:

a. COMPLETION PERIOD: The contractor shall begin work within 30 calendar days after receipt of notice to proceed, and shall complete construction of the new transmission line by December 1, 1985, and removal of the existing transmission line by April 1, 1986. The period allowed for the completion of the work shall be reduced by one calendar day for each calendar day in excess of 10 calendar days, or any extension thereof, elapsing between the contractor's receipt of and return of properly executed contract, and performance and payment

bonds as required in the Bid Form (Standard Form 21).

For notice to proceed purposes the contract is divided into three parts as follows:

PART A: Notice to Proceed will be issued as soon as practicable after award of the contract for preparatory work including planning, organizing, scheduling, and procurement of materials.

PART B: Notice to Proceed will be issued on or before May 1, 1984, for on-site work from Havre to Malta.

PART C: Notice to Proceed will be issued on or before August 1, 1984, for on-site work from Malta to Ft. Peck.

The relevant portion of paragraph 1.1.4.a states:

GENERAL: Pursuant to the General Provisions clause entitled 'Progress Charts and Requirement for Overtime Work,' the contractor shall submit to the Authorized Representative for approval a complete and practicable construction program ... within 45 calendar days after the date of the notice to proceed. The construction program shall show in detail his proposed plan of operations and shall provide for orderly performance of the work. Pending approval of his program, the contractor shall proceed with the work in accordance with these specifications and his proposed construction program.

In November of 1983, David Frame, president of ALB, began developing the schedule for ALB to follow during construction of the Fort Peck–Havre transmission line. According to David Frame, the schedule was further defined in January or early February, 1984. Under the schedule, ALB expected poles to be delivered to the project site beginning in April 1984 at Havre in mile 178, with pole hauling completed by the end of September 1984. Ground framing work was also to begin in April 1984. ALB expected to put on another ground

---

the mile followed by the number of the given pole within that mile.

3. Under the contract, gates were to be installed, where necessary, on access roads and along the fences set up along the right-of-way.

framing crew around June 1, 1984. The setting crew was scheduled to begin work in mid June, 1984.

ALB planned to begin stringing operations at the Havre substation in July 1984, and to reach the Harlem substation in October or November 1984. After wire stringing reached Harlem, ALB planned to energize that portion of the new line and take the old line out of service. The stringing crew was to reverse its direction and remove the existing line from Harlem back to the Havre substation, using some of the same equipment in the removal process as the stringing operation had used. This crew was to reach Havre in January 1985, and then to shut down for the winter. ALB planned to resume its stringing operations in March 1985, and to complete the stringing work at the end of August 1985. Removal of the old line was to be completed in November 1985.

After several revisions at the direction of WAPA, the "as-planned" schedule was approved by the contracting officer on March 28, 1984. The approved "as-planned" schedule is depicted in Exhibit 1025 and was introduced through the testimony of David Frame, the president of ALB.

David Frame testified at the trial that the actual construction of a transmission line involves five phases: (1) planning; (2) preliminary design and survey; (3) right-of-way acquisition; (4) material acquisition;[4] and (5) actual installation. On the Fort Peck–Havre project, the contractor, ALB, was responsible for material acquisition, the actual installation of new line, as well as the removal of existing transmission line.

The key construction phase of the instant project, that of actual installation, was very similar to an assembly line operation; however, on the Fort Peck–Havre project, the assembly crew was mobile. Different crews did the same task, structure after structure, moving straight down the trans-

mission line. The first installation phase of the Fort Peck–Havre project was staking, sometimes referred to as surveying. The staking phase involved reconnaissance of the right-of-way and access roads to find specific routes to each structure, marking where gates should be installed, surveying each structure site to make final determinations on the slope and difference of poles and marking the structure type. A two-man gate-building crew followed the staking crew to install gates where there were cross-bends. After the gate-building crew came a two-person road-building crew, generally an operator with a bulldozer and another individual with fuel, who acted as a scout. The road-building crew built crane landing pads at each structure site.[5] The pole-hauling operation followed, delivering poles to the site with a self-unloading machine. This was followed by two separate material haul operations, one for the cross-arms and another for insulators.

A four to six person ground-framing or assembly crew followed the material haulers. The ground-framing crew was responsible for assembling the transmission structure. Equipped with a crane-type device used for lifting up poles on large iron saw-horses, the crew assembled and bolted cross-arms, cross-braces, ground wire and other items to the pole. The ground-framing crew had a process for moving its production down the line. After the first structure of the day was assembled to a certain point, one man went ahead with the truck train, known as "the framing buggy," to pick up the next poles, set them in the framing jack, and start squaring and readying them. The other crew members stayed back and finished grounding the structure and cleaning up the structure site. These crew members then would catch up to the man with the framing buggy, and finish assembling the structure. The framing crew would repeat this process on down the line.

---

**4.** Material acquisition involved doing quantity takeoffs of materials, soliciting proposals from material suppliers, negotiating with suppliers, selecting suppliers, and forwarding written purchase orders for delivery of the materials.

**5.** Crane landing pads were built to accommodate the crane which set up each transmission structure.

A two-person digging crew followed to dig and auger the holes to the proper depth. On this job, there was also a ground wire crew which followed to install copper ground wire between the two holes at each structure and to connect them after the transmission structures were set. The erection crew (also called the setting crew) followed the digging crew. This crew had a large erection crane which lifted the complete structure, rotated it vertically and placed it in the holes. The crane apparatus included setting ropes and an eight-inch diameter steel spreader bar pipe, used to keep structures from binding as they were picked up. After the structure was leveled, the operator, foreman and perhaps one additional person, would start traveling with the crane to the next structure. The remaining crew members back-filled the holes with dirt, tamped the dirt with an air tamp, took the temporary setting ropes off the structure and moved to the next structure. The process then started again.[6]

After erection of the transmission structure, a work crew would string the wire. Stringing involved several operations. First, the crew attached travelers, or stringing blocks, to the bottom of insulators for the wire set-up. Simultaneous with this operation, a guard-pole crew installed temporary guard structures on each side of obstacles such as railroad crossings, roads or electrical lines so that the stringing operation would not cause any interference. A sock-line crew then started pulling line off the pulling machine and threading it through the travelers.[7] When the crew reached the end of a wire setup, generally two and a half miles down the right-of-way, they threaded the wire through a tensioning machine to hold the tension, so that the new conductor wire would not touch the ground. When the section of new wire had been pulled into place, it was sleeved to the previously pulled section of wire, using a hydraulic press to butt the ends of the old wire and new wire. The wire was then sagged to the specified tension. After sag-

ging, a lineman clipped the wire, in other words, attached it permanently to the bottom of the insulator. Finally, the wire was strung into the pole and dead-ended, meaning that it was stopped and clamped to the insulator. The dead-end crew also installed a jumper wire around the two dead-end points. Air-framing, anchor and guy-wire installation are part of the wire-stringing operation, but performed some time after setting, and before the wire-stringing operation itself.

### I. Change Order A001/Structure Height Changes Claim

Paragraph 1.1.3.a, "COMPLETION PERIOD," of the WAPA contract specifications states, in part:

> The contractor shall begin work within 30 calendar days after date of receipt of notice to proceed, and shall complete construction of the new transmission line by December 1, 1985, and removal of the existing transmission line by April 1, 1986....

> For notice to proceed purposes the contract is divided into three parts as follows:

>> PART A: Notice to Proceed will be issued as soon as practicable after award of the contract for preparatory work including planning, organizing, scheduling, and procurement of materials.

>> PART B: Notice to Proceed will be issue on or before May 1, 1984, for on-site work from Havre to Malta.

>> PART C: Notice to Proceed will be issued on or before August 1, 1984, for on-site work from Malta to Ft. Peck.

The notice to proceed for Part A was received by ALB on February 4, 1984. The notice to proceed for Part B was received by ALB on February 15, 1984. The notice to proceed for Part C was received by ALB on April 30, 1984.

---

6. On three-pole structures, the process varied depending on whether the structure needed cross-arms, in which case, the assembly took place by air framing, performed by linemen.

7. The plaintiff's pulling machines carried about 20,000 feet of continuous line, or about 4½ miles of wire.

At the February 15, 1984 preconstruction conference, WAPA agreed to release the available right of way for Part B on February 15, 1984, and the right-of-way for Part C around May 1, 1984. ALB agreed not to make a claim for parcels it skipped in the area identified in Part B of the WAPA contract prior to the date set in the specifications as the right-of-way release date for that part. Additionally, at the February 15, 1984 meeting, ALB submitted to WAPA for approval its bar graph construction schedule for approval in the form required by WAPA. The schedule, as submitted, showed ALB starting its wire stringing in mid-July 1984. Removal was to begin October 1, 1984. The mid-July date in the February, 1984 schedule roughly coincided with the date for the start of stringing in the November, 1983 "as-planned" schedule prepared by ALB's president, David E. Frame; and the removal date was the same under both schedules. WAPA, however, asked for clarification of individual substation markings and, for this reason, did not approve the schedule submitted by ALB on February 15, 1984.

Subsequently, in March, 1984, ALB submitted a revised schedule after a meeting between WAPA's construction representative, Daniel A. Paul, and David E. Frame, ALB's president. ALB again had revised the February 15, 1984 schedule to indicate ALB would start stringing wire in mid-September 1984, two months later than previously scheduled. WAPA approved the revised schedule submitted in March, 1984.

ALB began mobilizing equipment to the site in February 1984. Material began arriving at the site in mid-March 1984. On or about March 20, 1984, the pole hauler, Steve Stark, began delivery of poles at structure 154/5 near Chinook, Montana. He then proceeded west, delivering poles down the line towards Havre. ALB's ground-framing crew began work on March 22, 1984, at structure 154/5. ALB's hole digging crew began its work on or about April 11, 1984. The erection crew began its work at structure 154/5 on April 18, 1984. Starting from structure 154/5 near Chinook, Montana, ALB's pole haul-

ing, ground frame and erection crews worked their way westward to the Havre substation. Once the crews reached Havre, they returned to mile 154/5 and worked their way east to Fort Peck. By April 16, 1984, the pole hauler had reached mile 169, and the framing crew trailed by nine miles, working in the vicinity of the 160 mile post.

The contracting officer's technical representative ("COTR") for the project, Robert H. Jones, first learned of the problems which resulted in Change Order A001 from WAPA's transmission line designer, Bob Elmgreen, on April 6 or 7, 1984. Elmgreen told COTR Jones that WAPA had found problems with the conductor clearance to the high side profile, which would not meet National Electric Safety Code standards for conductor ground clearance. COTR Jones did not notify ALB of the problem because he was instructed by headquarters not to, due the fact that headquarters had not fully defined the extent of the problem. WAPA made a final determination as to the nature of the problem on April 12, 1984 and sent the contractor a contract modification on April 13, 1984.

Change Order A001, issued on April 13, 1984, required ALB to increase the height of a total of 112 structures along the transmission line. Change Order A001 states in pertinent part:

a. Electrical Clearance Standards require changes in the height of 112 structures. The Contractor is hereby directed to furnish structures in accordance with the attached revised structure listing.

b. The foregoing changes shall be definitized and a Supplemental Agreement to the contract will be negotiated to provide an equitable adjustment in the contract price. Said definitization shall be accomplished within thirty (30) calendar days after receipt of this Change Order.

c. Funds in the amount of $25,000 are provided for this change and shall not be exceeded.

By letter dated April 23, 1984, WAPA removed 6 structures from Change Order A001, thereby, necessitating a total change

of 106 structure heights. Then, by letter dated April 25, 1984, WAPA added 3 structures to Change Order A001, resulting in a net change to the height of 109 structures under Change Order A001.

On April 24, 1984, WAPA wrote ALB a letter requesting price quotations for 9 structure types and submission of costs incurred by ALB associated with Change Order A001. In pertinent part, the letter states:

> Please reference Modification A001, dated April 13, 1984. Due to the changes listed therein, we request you furnish, for our consideration, price quotations for the following items: [nine structures types identified] ...
>
> You should also furnish for our consideration any other costs incurred by you or your suppliers associated with Modification A001. All such costs must be submitted in sufficient detail to support your costs and to provide information for our review.

In response, on April 30, 1984, ALB wrote WAPA stating that additional costs would substantially exceed the $25,000.00 obligated for Change Order A001. ALB advised WAPA that some completed construction would have to be redone, that ALB was concerned about procurement of materials and timely availability of the necessary 233 longer poles, and that ALB would be experiencing delays in the receipt of poles not part of the change as a result of the impact of Change Order A001 on the suppliers' entire production system. Specifically, ALB's April 30, 1984 letter states:

> We are in receipt of your Change Order No. A001 on the above-referenced project and are proceeding with construction in accordance with the revised structure listing.
>
> Our additional costs as a result of this change are now approaching $25,000 which has been obligated and it is clearly evident that these additional costs will substantially exceed that amount. In ad-

dition to completed phases of the construction which will have to be redone, we are concerned with the procurement of materials—primarily the cost and availability in a timely manner of the 233 longer poles....

> ... [W]e are experiencing delays not only in receipt of the longer poles, but also poles which were not changed, as a result of the impact which this change has had on our supplier's entire production system.
>
> ... [W]e anticipate that our total additional costs as a result of this change order will be in excess of $600,000. We are now definitizing these costs for submittal.
>
> In order to prevent further delays, we are requesting your authorization to proceed with the work in excess of the $25,000 obligate [sic] and an additional obligation of funds for this work....

On May 2, 1984, ALB met with WAPA officials, including COTR Jones. This meeting was memorialized in minutes prepared by Miner & Miner, Consulting Engineers, Inc., WAPA's contract inspector, and in notes taken by Ralph Frame of ALB.[8] During the discussion of Change Order A001 at the May 2, 1984 meeting, ALB advised WAPA that the owner of Taylor Lumber wanted to stop delivering poles to the project until Taylor Lumber had a chance to fully analyze the situation regarding the poles, and until Taylor Lumber was assured that they would get paid the extra costs incurred as a result of the changes. In response, COTR Jones specifically told David E. Frame, the president of ALB, to continue with the project and that ALB and its pole supplier, Taylor Lumber, would be paid what they were due. According to the testimony of COTR Jones, "I indicated to Mr. Frame that Western [WAPA] would be equitable in determining the extra costs incurred by Taylor Lumber Company and American Line Builders." Moreover, a report of the May 2, 1984 meeting, prepared by Miner & Miner,

---

**8.** As is discussed more fully below, at this meeting, COTR Jones also told ALB that there were more cultural sites than originally anticipated, that the cultural sites restrictions would take longer to clear up than anticipated, and that mitigation digs might be performed at the east end of the project as late as the summer of 1985.

WAPA's contract inspector, states in pertinent part:

> Dan Paul reinforced that we [WAPA and WAPA's contract inspector, Miner & Miner] want to help the contractor any way we can.
>
> Pole Size Changes
>
> How will changes with pole supplier be handled? As equitable as possible.

On May 1, 1984, Robert L. Donelson, Chief, Construction Management Branch at WAPA, visited Taylor Lumber, the supplier of wood poles to ALB. Mr. Donelson's memorandum, dated May 14, 1984, states in part:

> At a wrap-up meeting with Barney Olberg and Steve Stark, John C. Taylor's Montana jobsite expediter, we discussed how the Government's change in the + 112 pole structures would affect Taylor's costs. They indicated there were some additional costs which could be summarized as follows:
>
> 1. Changed pole length on a structure already delivered to the transmission line required a truck to make an additional trip with the correct length pole (2).
>
> 2. Poles over 95 feet long must be shipped by rail or by truck using a steerable rear tractor. (There are four poles in this category.)
>
> 3. The prime contractor was about to frame some structures at the job site that would be affected by the subject change. John C. Taylor utilized their pole drying shed to pressure treat a few poles on short notice to prevent jobsite delays due to lack of poles.

Mr. Olberg indicated that they had shipped about 400 poles to the jobsite out of about 2,900 poles required when the change occurred. He could not accurately estimate John C. Taylor's rescheduling costs at their Sheridan plant due to the change, but indicated that they were minor. (I estimate less than $5,000.) Pole relocation costs at the jobsite were based on actual expenses and he *may* bill the prime. (I estimate less than $20,000). Mr. Olberg indicated that if the job went well for them (John C. Taylor made money), he probably would not charge American Line Builders anything for the subject changes.

(Emphasis in original.)

On May 7, 1984, ALB rote WAPA a letter stating:

> We are continuing with pole changes on the reference amendment per your instructions to Warren Sorenson and Dave Frame on May 2, 1984 at the ALB–WAPA–Miner & Miner management meeting in Havre, Montana. Costs have exceeded the $25,000.00 obligated by Amendment # 1 but are continuing per your instructions.

On May 10, 1984, ALB wrote WAPA another letter stating:

> Per your request of April 24, 1984, we are hereby submitting the following unit prices for structure types/heights added to the contract: [nine structure types identified] ...
>
> These prices do not include additional costs which have been or will be incurred by American Line Builders, Inc. as a result of Modification A001 other than those specifically stated above.

On June 4, 1984, ALB wrote WAPA a letter stating:

> We are still proceeding with construction in accordance with the above referenced change order [A001].
>
> Our summary of additional costs of construction as a result of the change is not yet complete. We are awaiting receipt of cost information from our suppliers and additional work required as a result of the change is not yet complete.
>
> We will submit our additional costs for your review as soon as they are available.

Effective August 27, 1984, a Supplemental Agreement under Change Order A004 was executed by ALB and WAPA. The agreement established unit prices for structure types and heights not contained in the original WAPA contract as a consequence of Change Order A001. Paragraph C of the modification states:

> This document establishes unit prices for structure types and heights not contained in the contract schedule and

makes changes in existing Schedule Items due to variations and does not consider changes in contract amount due to miscellaneous costs incurred by the contractor and/or suppliers as a result of Change Order A001, effective date 4/13/84. Contractor and/or suppliers' incurred costs will be considered by a future document.

## II. Cultural Resource Site Restrictions [9]

Paragraph 1.5.5.b of the WAPA contract specifications, "KNOWN CULTURAL SITES," states:

> b. KNOWN CULTURAL SITES: Following issuance of notice to proceed, Western [WAPA] will provide the contractor with two sets of Plan and Profile drawings showing all known significant historical or archeological sites located on or immediately adjacent to the transmission line right-of-way. These sites shall be considered avoidance areas. Prior to any construction activity, the contractor shall mark the avoidance areas on the ground to the satisfaction of the Authorized Representative. There are approximately 20 sites involved. The contractor shall instruct his employees, subcontractors, or other representatives that vehicular or equipment access to these areas is prohibited. If access is absolutely necessary, the contractor shall first obtain approval from the Authorized Representative. The ground markings shall be maintained throughout the duration of the contract. Western [WAPA] will remove the markings at its discretion during or following final cleanup.

As indicated, paragraph 1.5.5.b, the contract specification for known cultural sites, states that following the issuance of the notice to proceed, WAPA would provide the contractor with two sets of plan and profile drawings showing all known significant cultural resource sites located on or adjacent to the transmission line right-of-way. The sites were considered avoidance areas,

but if access was absolutely necessary, the contractor was to obtain approval from WAPA's authorized representatives to enter the area. The bid documents state that there were approximately 20 cultural resource sites (avoidance areas) involved in the project pursuant to the contract at issue.

Moreover, paragraph 1.5.5.d of the contract specifications, "CONTRACT ADJUSTMENTS," states:

> d. CONTRACT ADJUSTMENTS: Where appropriate by reason of a discovery [of a cultural resource site], the Contracting Officer may order delays in the time of performance, or changes in the work, or both. If such delays, or changes, or both, are ordered, the time of performance and contract price shall be adjusted in accordance with the applicable clauses in the General Provisions.

Therefore, under the contract, the contracting officer could order delays in the time of performance, changes in the work or both, and could adjust the time of performance and contract price in accordance with the contract's general provisions. During the course of the project, WAPA identified a total of 31 cultural resource sites along the transmission line.

There were transmission structures actually located within the boundaries of cultural sites at mile 170, mile 144, mile 70, mile 50, mile 31, mile 28, mile 13, and mile 12. WAPA issued numerous travel restrictions, with directions to "stay off until further notice," and "no travel allowed on site," on many of the cultural sites. WAPA lifted the last of the cultural site restrictions on November 2, 1984.

On February 21, 1984, WAPA transmitted a letter to ALB which identified 16 cultural sites with restrictions, including instructions to "stay north of fence" at sites 24HL196 and "stay off until further notice" at sites 24HL192 and 24BL575. On

---

**9.** The parties have interchangeably referred to these sites as cultural resource sites, archeological sites or arch sites. For the purposes of this Opinion this court will refer to these sites as "cultural resource sites," unless the court finds itself quoting a portion of the contract or a submission of a party in which a different term is utilized.

April 13, 1984, WAPA transmitted another letter to ALB reconfirming that the previous restrictions were still in force. In this letter, WAPA stated that they hoped to have their cultural resource mitigation plan approved by the State of Montana by May 1, 1984, and at that time, WAPA would provide detailed instructions for each site.

On May 6, 1984, ALB wrote WAPA a letter stating that some transmission line structure sites were inside areas where WAPA had prohibited access in its April 13, 1984 letter. In that May 6, 1984 letter, ALB objected that information on the restrictions was not available to it at the time the project was bid. ALB requested approval to enter structure sites as they fell into its planned sequence of operations. In addition, ALB advised WAPA that if these sites had to be bypassed and constructed at a later date, there would be additional costs and construction time required to complete the project.

In response, on May 11, 1984, WAPA transmitted a letter to ALB stating that the cultural resource site restrictions were still in effect and that ALB's request to enter those sites was denied. However, WAPA wrote: "Hopefully, we will be able to lift those restrictions in the next two weeks." Notwithstanding WAPA's optimistic representations, the restrictions were not lifted. During the course of that year, WAPA transmitted various letters relaxing some restrictions, lifting others, and imposing strict restrictions on still other cultural sites. For instance, on June 22, 1984, WAPA transmitted a letter to ALB identifying 15 cultural sites to which restrictions applied. Six of these cultural sites continued to have "no travel allowed on site" restrictions, which clearly impaired ALB's operation.

As late as October 9 and 12, 1984, WAPA was still transmitting letters to ALB restricting construction activities at certain sites until WAPA's mitigation plan had been completed. It was November 2, 1984, before WAPA transmitted a letter to ALB which lifted restrictions to the last cultural resource sites which directly affected ALB's operations.

III. Right–Of–Way Restrictions/Releases

The WAPA contract specifications, paragraph 1.3.1, establish that WAPA had the responsibility to provide the right-of-way for the transmission line over routes identified by WAPA. Additionally, paragraph 1.3.1 of the contract specifications, "RIGHT–OF–WAY," states:

> Western [WAPA] will provide the right-of-way for the transmission line and right-of-way for access thereto over routes established by Western. The contractor is cautioned that various wooded bridges across irrigation canals may not support heavy construction vehicles and/or loads. The contractor should visit the area prior to bidding to determine allowable loads.

\* \* \* \* \* \*

WAPA represented that it acquired access easements from existing public roads to the transmission line, in order to provide access to structure sites not accessible by traveling the transmission line. Specifically, paragraph 1.3.1 of the contract specifications states:

> ... Western [WAPA] has acquired access easements from existing public roads to the transmission line and as considerable amount of off right-of-way access along the transmission line. This off right-of-way access route is to provide access along the transmission line to structure sites not accessible by traveling the transmission line. Western does not represent that the contractor can gain access to every structure site or travel continuously along the transmission line. The contractor shall either orient his construction methods and equipment to utilize Western furnished rights-of-way or obtain additional temporary access at his own expense. Any additional temporary access acquired by the contractor must have prior approval by Western since several areas of the trans-

mission line do have travel restricted areas. . . .

WAPA did not represent that ALB could gain access to every structure site or travel continuously along the transmission line. In fact, paragraph 1.3.2, "ACCESS TO THE WORK AND HAUL ROUTES," states:

a. GENERAL: Rights-of-way for access to the work from existing roads be will provided by [WAPA] as specific hereinbefore. . . .

\* \* \* \* \* \*

The contract shall make his own investigation of the condition of available public or private roads and of clearances, restrictions, bridge-loads limits, bond requirements, and other limitations that affect or may affect transportation and ingress and egress at the jobsites. The unavailability of transportation facilities or limitations therein shall not become a basis for claims for damages or extension of time for completion of work. The contractor shall construct and maintain any haul roads, access roads, bridges, or drainage structures required for construction operations.

At the time of bid, WAPA made available a plan and profile, which showed where the transmission line was supposed to run and identified the available access roads. Contrary to the plan and profile drawings included in the solicitation, it is clear from the record that WAPA encountered numerous difficulties in obtaining access to cultural sites, roads, and parcels. During the course of the project, WAPA either did not obtain the right to use access roads which had been identified in the plan and profile, or it granted, then rescinded the right for plaintiff to use various of those access routes.

On April 27, 1984, WAPA, transmitted a letter to ALB which indicated that 29 tracts "have not been obtained to date on the transmission line." WAPA also states in the letter:

You should also note that AR [access routes] 725 is not included. It will not be used because of the Cultural Resource site; travel in this area will be along the centerline.

On May 24, 1984, WAPA transmitted to ALB a letter which served to release 21 parcels for construction activities. Less than a week later, on May 30, 1984, WAPA transmitted another letter to ALB. In the May 30, 1984 letter, WAPA enclosed a full-size plan and profile drawing, which reflected the removal of access road AR–725. Furthermore, on October 3, 1984, WAPA transmitted another letter to ALB rescinding the right to use access roads AR–1725D and AR–1725F on parcel No. 125.

Additionally, structures 113/7 and 114/4 through 114/8 are located on parcels 316 and 318 and entered by access road 5983. On April 27, 1984, WAPA released parcels 316 and 318 for construction activity. WAPA experienced difficulty in securing the right-of-way release on the parcel covering miles 113 to 114. In a letter dated June 29, 1984, WAPA withdrew permission for ALB to enter parcels 316 and 318. Then, in a letter dated July 2, 1984, WAPA re-authorized ALB to enter parcels 316 and 318. Due to the difficulty in negotiating the right-of-way, the WAPA chief inspector elected not to allow construction of approaches at a private road bisecting the parcel. WAPA did not secure a right-of-way release to parcel 334 in miles 124 through 126 until July 24, 1984. By letter, dated July 24, 1984, WAPA released Parcel 334 for construction activities. Parcel 334 included five structures, 125/7 through 126/3, and three access roads, AR–6683, AR–6688, AR–6702.

IV. Structure Moves

In addition to Change Order A001, WAPA also ordered ALB to move or change various other structures. Specifically, the parties have stipulated that WAPA ordered ALB to move or change structures, including:

| Structure | Date of Written Instruction | Nature of Change |
|---|---|---|
| 157/5, 158/3, 171/6 | | Re-stake structures to provide clearance from gas lines |
| 149/4 | 6/19/84 | Move location and increase pole height |
| 127/7 | 5/7/84 | Move location and increase pole height |
| 80/3 | 8/17/84 | Move structure |
| 79/7 | | Move guy wires |
| 79/6 | 7/19/84 | Move location and increase pole height |
| 76/1 | 7/31/84 | Move structure and increase pole height |
| 58/2 | 8/15/84 | Move structure |
| 9/5, 8/6 | 10/15/84 | Exchange structures to account for flooding |
| 1/8 | | Move structure |
| 1/6 | 10/25/84 | Move structure |

Although there also were other ordered moves or changes to structures, those did not impact upon ALB's operations. The changes detailed above, which indicate a "date of written instruction" represent those which were reduced to writing. For structures 157/5, 158/3, 171/6, 79/7 and 1/8, however, WAPA gave oral instructions to move or to change structures, without confirming these in writing. Nonetheless, for those changes ordered orally, the parties have stipulated that WAPA did instruct the changes to be made.

V. Change Out of Pins to Bolts

Pursuant to the general specifications, paragraph 3.8.1, on March 27, 1984, ALB submitted shop drawings pertaining to the installation of insulator hardware. These drawings included drawing no. 6018, plan sheet 41, of the insulator assemblies from the hardware manufacturer depicting the hot line type socket clevis pins. ALB transmitted the shop drawings to WAPA's Golden, Colorado office with a letter marked "For Approval." In a letter dated April 23, 1984, Alan Lucas, WAPA's power branch chief, indicated to ALB that the insulator assembly drawings, overhead groundwire assembly drawings, and catalog sheets, which included the hot line socket clevis pins, were acceptable, in accordance with contract specification paragraph 3.8.1.

ALB began installing hardware, including the clevis pins, in December 1984 and for over five months continued installation, through May 15, 1985. During this time, WAPA's inspection contractor, Miner & Miner, continually inspected ALB's activities along the transmission line. WAPA inspectors also periodically inspected ALB's activities. On May 16, 1985, five months after ALB began installation of the hardware, the WAPA inspector verbally rejected the installation of the clevis pins on the grounds that the pins did not meet contract requirements and directed the installation of bolts, nuts and cotter keys in

place of clevis pins. By letter, dated May 20, 1985, WAPA instructed ALB to furnish and install hardware according to contract specification paragraph 3.3.2.f., "ASSEMBLY COUPLING HARDWARE."

On June 4, 1985, ALB wrote WAPA a letter stating, in part:

This is in reference to your letter (b3130) dated May 20, 1984, wherein we were instructed to correct hardware previously installed.

... It is WAPA's contention that the part as installed does not meet the requirement of the specifications, Para. 3.3.2.(f).

In regard to the above, please note the following:

1. In accordance with the specifications, shop drawings of insulator assemblies from the hardware manufacturer were submitted to WAPA in Golden, Co. with a copy to the Huron office. WAPA reviewed the drawings in detail and approved them. The review was made by WAPA personnel knowledgeable enough to have observed the change from bolts to pins.

2. The material involved was inspected in the plant and approved by WAPA personnel prior to shipment.

3. Installation of the material began in the field during December, 1984 and continued until noticed just prior to May 16, 1985. Installation covered a distance of approximately 100 miles.

4. During installation of the 25 dead-ends in the 100 miles of line, an inspector from Miner & Miner was present at all times. Although he inspected the work in detail, he did not notice the difference in material.

5. The WAPA chief inspector was also on the project at all times and did not notice the discrepancy between the drawings and specifications.

We have ordered replacement bolts, nuts and keys and are replacing the pins as directed. However, it is our opinion that the specifications and drawings are ambiguous regarding part 28.53 and that the difference is

very difficult to detect by anyone other than WAPA personnel.

Because of the facts as stated above and because of the ambiguity of the specifications and drawings, we feel that WAPA is responsible for the cost to change out the pins involved. ALB will submit these costs as they are determined.

### VI. Guy Wire Spacers

ALB's original complaint included a claim for "Guy Wire Spacers." This claim was also presented in the pre-trial submissions and at trial. Moreover, the "Guy Wire Spacer" claim was raised in the first round of post-trial briefs. In numerous subsequent submissions, however, the parties indicated that they were in the process of settling the "Guy Wire Spacer" claims and that unless the court was informed of settlement difficulties the court would not be required to rule on the claims. Subsequently, the court was informed by the parties that the "Guy Wire Spacer" claim has been settled, although, to date, no payment to reflect the settlement appears to have been made to the plaintiff.

### VII. Stringing, Clipping, and Dead Ending

As David Frame, president of ALB, testified, ALB originally contemplated beginning its stringing operation at the Havre substation in July 1984, and reaching the Harlem substation in October or November 1984. After wire stringing had reached Harlem, ALB planned to energize that portion of the new line and take the old line out of service. The stringing crew was to reverse its direction and remove the existing line from Harlem back to the Havre substation. This crew was to reach Havre in January 1985, then shut down for the winter and resume stringing in March 1985.

The "as-planned" schedule bar graph submitted by ALB to WAPA in February 1984 showed a mid-July starting date for stringing operations. After the February 15, 1984 preconstruction meeting, David Frame moved back the stringing start-up

date to mid-September 1984. David Frame moved the date back in response to information he had received from WAPA's construction representative, Daniel Paul, that there were right of way and cultural site access problems which had not been raised at the meeting, that cultural site access would be more restrictive than stated in the specifications and that some sites would not be available by the time ALB anticipated beginning its stringing. Taking into consideration Daniel Paul's cautionary statements, ALB submitted a revised bar graph schedule to WAPA in March 1984, which was then approved on March 28, 1984 by the contracting officer.

After Change Order A001 was issued, on June 21, 1984, ALB submitted an updated schedule which indicated that the start-up date for the stringing operation had changed from mid-September 1984 to mid-October 1984. The schedule submitted on June 21, 1984, also shows that the stringing operation was to stop in December for the winter months.

On September 27, 1984, ALB submitted another schedule. This schedule indicated a delay of the start-up of its stringing operations until the beginning of November 1984. Additionally, the September 27, 1984 schedule projected a winter shut-down date at the end of January or first of February 1985. ALB's stringing operations on the Fort Peck–Havre project actually began on or about November 18, 1984. Consequently, ALB had to string through the winter in order to meet its overall "as-planned" schedule of September 25, 1985.

VIII. Davis–Bacon Act Reclassification

ALB's Davis–Bacon claim emanates from WAPA's direction to ALB to reclassify certain of its employees.

General Provisions, Clause No. 29, "DAVIS–BACON (40 U.S.C. §§ 276a–276a–7)," states, in part: "Such laborers and mechanics shall be paid the appropriate wage rate and fringe benefits on the wage determination for the classification of work actually performed...." In addition, General Provisions, Clause No. 34, "WITHHOLDING," states in part: "The Contract-

ing Officer shall upon his/her own action ... withhold or cause to be withheld from the Contractor under this contract ... so much of the accrued payments or advances as may considered necessary to pay laborers and mechanics ... the full amount of wages required by the contract."

On May 4, 1984 WAPA transmitted a letter to ALB stating that an ALB employee, Mike Bader, should be classified and paid as a mechanic in lieu of a groundsman. Specifically, WAPA's May 4, 1984 letter states:

Upon review of your payrolls submitted to this office, the following discrepancies were noted:

*Payroll No. 4—Week ending March 24, 1984:*

Mike Bader—Should be classified and paid as mechanic in lieu of groundsman.

*Payroll No. 5—Week ending March 31, 1984:*

Mike Bader—Should be classified and paid as mechanic.

*Payroll No. 6—Week ending April 7, 1984:*

Mike Bader—Should be classified and paid as mechanic.

*Payroll No. 7—Week ending April 14, 1984:*

Mike Bader—Should be classified and paid as mechanic.

*Payroll No. 8—Week ending April 21, 1984:*

Mike Bader—Should be classified and paid as mechanic.

Please review these discrepancies and submit corrected payrolls to this office as soon as possible.

On May 18, 1984, WAPA wrote ALB a letter outlining what WAPA believed was the proper make-up of the framing and erection crews. WAPA's May 18, 1984 letter states:

This office believes the following classifications represent the proper makeup of the respective crews:

| Framing Crew | Erection Crew |
|---|---|
| Lineman (1) | Lineman (1) |
| Line Equipment Operator (1) | Line Equipment Operator (1) |
| Groundsman | Groundsman |

In addition, in the May 18, 1984 letter, WAPA requested that ALB reclassify and pay the affected employees in accordance with the following:

The payrolls requiring corrections in regard to the above matter are as follows:

No. 4, week ending March 24, 1984—framing crew.

No. 5, week ending March 31, 1984—framing crew.

No. 6, week ending April 7, 1984—framing crew.

No. 7, week ending April 14, 1984—framing crew.

No. 8, week ending April 21, 1984—framing and erection crew.

No. 9, week ending April 28, 1984—framing and erection crew.

WAPA threatened to withhold payments from ALB if the problem was not corrected by June 15, 1984. Specifically, the May 18, 1984 letter to ALB states: "If this problem is not corrected by the June 15, 1984, payment voucher, an amount equal to the amount owed to employees will be withheld from that payment." Although, initially, ALB had objected to WAPA's direction, after WAPA withheld progress payment money, ALB made the reclassification under protest.

IX. Removing Transmission Line

Paragraph 2.1.1. of the specifications, "REMOVING TRANSMISSION LINE," provides, in pertinent part, as follows:

The item of the Schedule entitled 'Removing existing transmission line' includes removing all conductor, complete with all accessories, and wood pole structures, including guys and anchors, and performing backfill and necessary grading at structure sites. Time schedule for commencing removal of the existing transmission line is provided for under the 'Commencement, Prosecution, and Completion of Work' paragraph.

In addition, paragraph 2.1.1 contains the following notice:

A large portion of the existing transmission line is in either irrigated or dryland fields. No equipment will be allowed in any field with a growing crop.

The existing line was constructed in 1934–1935 and is wood pole, H-framed with three conductors and without overhead ground wire.

For information, the following list gives approximate quantities of materials which shall be removed. The contractor shall determine actual quantities and regardless of the quantities removed, payment will only be made for the lump sum price bid in the Schedule.

| | |
|---|---|
| Two–Pole Structures . . . . | 1,521 |
| Three–Pole Structures . . . | 121 |
| Six–Pole Structures . . . . . with Switches | 2 |
| Single Guys . . . . . . . . . . . | 746 |
| Double Guys . . . . . . . . . . | 270 |
| Single Anchors . . . . . . . . | 640 |
| Double Anchors . . . . . . . . | 125 |
| 300–Kcmil Copper . . . . . . . Conductor | 39.5 miles |
| 477–Kcmil ACSR . . . . . . . | 149.1 miles |

\* \* \* \* \* \*

ALB's "as-planned" schedule indicates that ALB intended to begin removal operations from Havre toward the Harlem substation beginning in October, 1984, and complete removal to Harlem in January, 1985. The schedule shows ALB removing the line between Malta and Richardson Coulee starting in Malta in early August, 1985, continuing removal to the Richardson substation through the end of September, 1984, and completing removal operations in mid-to-late October, 1985.

As ALB began experiencing problems with its stringing operation, however, the rippling effects also had an impact on the "as-planned" removal schedule. The delays ALB incurred in the stringing process, in turn, impacted the removal operation, since the new transmission line had to be completed from Havre to Harlem and connected into the Harlem substation before the old line could be de-energized and removed. Ultimately, ALB pushed back its removal starting date for the Havre to

Harlem section on the west end of the transmission line from October 1984 to the end of December, 1985. WAPA accepted the removal of the existing transmission line as substantially complete effective April 1, 1986.

X. Re-mobilization

Re-mobilization, in the case at bar, refers to the process undertaken by ALB to mobilize its equipment from the WAPA project site, from places en route to the WAPA project site and, after WAPA issued Change Order A001, from Colorado, to an ALB project site in California and back to the WAPA project site.

At the time of bid on the instant contract, ALB anticipated using its own equipment, as well as leasing some of the equipment needed for the stringing portion of its work on the WAPA project. In addition, between January through July 1984, ALB purchased approximately 20 pieces of stringing equipment, as well as equipment such as pickup trucks, and diggers, which have universal application on a project such as the WAPA project. ALB began mobilizing equipment to the WAPA site in February 1984. By May, 1984, ALB had mobilized stringing equipment, including a sagging machine, several diggers, pickup trucks, lowboys and floats, wire trailers, and wire tensioner, to the WAPA site.

On April 13, 1984, WAPA issued Change Order A001. In addition, from February to November, 1984, ALB received a series of communications concerning cultural resource site access problems, and problems regarding the availability and withdrawal of access routes and parcels. The stringing equipment ALB intended to use for the WAPA project was in three locations at this time. Some of the equipment had already been moved to the WAPA project site, some of it was in transit to the project site and some of it was at a location in Colorado, where ALB had just purchased substantial additional amounts of stringing equipment. Because of the delays on the WAPA project, ALB decided to take the stringing equipment which was already at the WAPA site, enroute or scheduled to come to the site, and temporarily transfer it to another project on which ALB was working in California, before bringing it back to the WAPA site.

XI. Extended Home Office Overhead

ALB contends that it incurred extended home office overhead costs because of the additional time ALB had to remain on the WAPA project in order to complete the removal work, beyond what was contemplated in its bid. According to the plaintiff, the extended home office overhead costs were incurred because the schedule for ALB to remove the old line between the Havre and Harlem substations from October, 1984, to January, 1985, could not be met as a result of Change Order A001 and the unavailability of the Havre substation at the projected time for a tie-in of the wire. ALB's home office functions include obtaining and maintaining insurance and bonding, purchasing materials, paying vendors, invoices, processing accounts payable, maintaining payroll, preparing certified payroll documents, coordinating with suppliers, coordinating equipment and personnel, and doing the bidding and estimating work.

XII. Retightening Hardware

Contract specification paragraph 3.2.2.a.(4), "WOOD–POLES," references Federal Specification TT–W–571 for treatment of wood-poles. TT–W–571 lists several species of wood-poles and several acceptable methods of treatment for each species. ALB selected the waterborne preservative method, ACA (Chemonite), which, therefore, was used by ALB's subcontractor, Taylor Lumber Company, to treat all pole supplies.

Contract specification paragraph 3.2.4.a., "CONSTRUCTING WOOD–POLE STRUCTURES," states in part: "All nuts and locknuts used in the structures shall be tightened adequately but not excessively." ALB tightened the hardware at the bolts that hold the cross-arm and cross-braces on the bands on the top of the poles, and the brackets that hold the insulators to the cross-arms and bolts that go through the

wood products and tighten on the metal products as required during its stringing operation. ALB also tightened the hardware on as needed basis during its stringing operation.

In February 1985, ALB had a meeting with WAPA. At the meeting, the issue of retightening the hardware was raised. At this time, WAPA requested that ALB submit a price quotation for the retightening of hardware.

On February 22, 1985, in response to the meeting, ALB wrote WAPA a letter stating in part:

As per your request during our meeting of February 19, 1985; we are submitting the following price quotation for tightening of hardware attached to the poles.... $38.00 per structure.

Please issue a contract change order for the work.

On the same date, February 22, 1985, COTR Jones transmitted a letter to ALB stating in part:

Prior to installing the new transmission line at Havre, Harlem, and Malta substations and energizing the individual segments of the transmission line, all aerial clean-up must be completed. In addition, during our review of the first thirty miles of transmission line, we have noticed considerable shrinkage of the poles. Therefore, under paragraph 12 of the General Provisions (page 88 of 142) it is your responsibility to check and retighten, if necessary, all nuts and locknuts used in the structures.

ALB checked and retightened all nuts and locknuts under protest.

*Claim History*

WAPA accepted the construction of the new Fort Peck–Havre transmission line, as substantially complete on October 1, 1985. Moreover, effective April 1, 1986, WAPA accepted the removal of the existing transmission line as substantially complete.

By letter dated November 25, 1985, ALB submitted a claim to WAPA for additional compensation. ALB's claim amounted to $643,198.00 for costs incurred as a result of structure height changes, changes associated with the number of cultural sites, delays in rights of way, access road releases and structure changes/moves after the issuance of Change Order A001.

By letter dated December 20, 1985, the government requested detailed information to aid it in its evaluation of ALB's claim. By letter dated January 29, 1986, the government was notified that Nourse & Associates had been retained by ALB to pursue its claim. Three days later, by letter dated January 31, 1986, WAPA requested that the Office of the Inspector General conduct an audit of the contractor's November 25, 1985 claim. The office issued its audit report on September 10, 1986.

WAPA prepared a "Lessons Learned Report," dated February 5, 1986, which states:

PURPOSE: The purpose of this report is to provide feedback to Headquarters design and constructions personnel on (1) problems encountered during construction and (2) the performance of the contractor.

The Lessons Learned Report states further:

*Contractor Data*

The work accomplished by American Line Builders, Inc., (ALB) was generally of very high quality. ALB's supervision assigned to the work site was of marginal quality, thus requiring [WAPA's] field forces to highly contribute to the work planning process.

\* \* \* \* \* \*

*Other Field Problems*

1. After field activities had been underway for three months, it was discovered that 112 structures did not have high side profile conductor clearances. This caused significant schedule changes for the pole treatment plant, pole deliveries to structure sites, and field construction operations.

2. Delays were also encountered in performing necessary mitigation on cultural resource sites and again the contractor was delayed in performing work on various sections of the transmission line.

3. Again no one checked the phasing between substations until the Havre–Harlem section was almost ready to be energized. Two SAT structures were added to the transmission line and phasing changes were made at Havre and Richardson Coulee Substations to correct the problem.

By letter dated December 4, 1986, Nourse & Associates submitted, on behalf of ALB, a claim of $1,768,089.20 and a request for a time extension of 200 days. This claim included the original request of $643,198.00 made by ALB's letter dated November 25, 1985, with additional claims submitted in eight parts.[10] On December 19, 1986, on behalf of ALB, Nourse & Associates requested, by letter, that WAPA issue a contracting officer's decision.

On April 23, 1987, WAPA transmitted to ALB its contracting officer's decision upon ALB's total claim submitted in December 1986. In its decision, the contracting officer found that Change Order A001 did result in creating some increases in costs and time to the contractor's operations and granted $12,470.00 to ALB for the additional costs. On claim two, cultural resources sites, the contracting officer's decision indicates that of the total 31 cultural sites, 9 affected the contractor's operations and awarded $4,731.00 to ALB for the additional cost. On claim three, right-of-way releases, the contracting officer's decision found that WAPA's delay in releasing parcel 334 resulted in additional costs of $1,598.00 to ALB. As for claim four, the contracting officer's decision recognized that the WAPA's moves/changes at structure locations, after Change Order A001, did result in an increase in costs and time to ALB and awarded $4,612.00. The contracting officer, therefore, found that ALB was due a total equitable adjustment of $23,411.00. The balance of the contractor's claim for $643,193.00 for change out of pins and bolts, supply guy wire spacers, stringing, clipping and deadending, Davis–

Bacon Act classification changes, removal operations, structure height changes, extended overhead, tightening hardware and plumb structures, and an additional 200–day extension was denied.

On December 4, 1987, the contracting officer issued Change Order A013, incorporating his April 23, 1987 decision. Paragraph "A" of Change Order A013 states:

A. The contract is modified to incorporate the Contracting Officer's decision of April 23, 1987, on claims submitted in connection with structure height changes, cultural resource sites, rights-of-way, and moved/changed structures. The Contracting Officer determined the Contractor is due the following equitable adjustments:

| | |
|---|---|
| Structure height changes | $12,470 |
| Cultural resource sites | 4,731 |
| Rights-of-way | 1,598 |
| Changed/moved structures | 4,612 |
| TOTAL | $23,411 |

Paragraph "D" states:

D. By reason of A & B, above, the contract amount is increased from $11,781,729.91 to $11,809,337.10, a net increase of $27,607.19.

Plaintiff, ALB, subsequently filed a "Complaint For Additional Compensation" in the United States Claims Court. In its prayer for relief, the plaintiff seeks additional compensation in the amount of $1,768,089.20 for 12 separate items. After extensive discovery and numerous motions for enlargements of time, an exhaustive ten day trial was held. Thereafter, the parties filed a series of extensive, and sometimes confusing and contradictory, post-trial briefs.

## DISCUSSION

In asserting its entitlement to an equitable adjustment, the plaintiff advances 12

---

10. The December 4, 1986 letter added claims for: change of pins to bolts; supply guy wire spacers; stringing, clipping and deadending; Davis–Bacon Act classification changes; removal operations; re-mobilization costs; extended overhead; and, tightening hardware and plumbing structures.

individual claims: I. Change Order A001/Structure Height Changes Claim; II. Changes in Cultural Resource Sites; III. Changes in Right-of-Way Releases and Restriction to Obtaining Access; IV. Structure Moves; V. Change Out of Pins to Bolts; VI. Guy Wire Spacers; VII. Stringing, Clipping and Deadending; VIII. Changes in Davis–Bacon Act Classifications; IX. Delays in Removal Operations; X. Additional Re–Mobilization Costs; XI. Extended Home Office Overhead Costs; and XII. Tightening Hardware and Plumbing Structures.

█ In brief, the plaintiff, ALB, argues that this case is based on an unreasonable delay which was caused by the government. The plaintiff, citing, among other cases, *Avedon Corp. v. United States*, 15 Cl.Ct. 648, 653 (1988), contends that the contractor in such a case has the burden to show that: 1) the delay was for an unreasonable length of time; 2) the delay was proximately caused by the government's actions; and 3) the delay resulted in some injury to the contractor. Furthermore, according to the plaintiff, the standard of proof to be applied is that of the preponderance of the evidence. Plaintiff claims that when a contract change causes an increase in the cost of performance of any part of the work under the contract, whether or not changed by a formal change order, the contract price should be equitably adjusted.

Moreover, citing *Avedon Corp.*, 15 Cl.Ct. at 658, and *Beauchamp Constr. Co. v. United States*, 14 Cl.Ct. 430, 438 (1988), plaintiff argues that a delay due to defective specifications is *per se* unreasonable. Plaintiff further argues that there is a presumption that a significant delay resulting from defective government specifications will affect the contractor's other work, and that to overcome this presumption the government must demonstrate that the contractor could not have performed the project in less time than it did, even without the defective specifications. Finally, the plaintiff argues that the contractor must establish its damages with reasonable accuracy, and that the govern-

ment is free to dispute the damages alleged.

The defendant, on the other hand, argues that entitlement to an equitable adjustment in this case should be resolved under the Changes clause. Accordingly, based on *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 199, 351 F.2d 956, 966 (1965); *River Construction Corp. v. United States*, 159 Ct.Cl. 254, 270 (1962); *Addison Miller, Inc. v. United States*, 108 Ct.Cl. 513, 70 F.Supp. 893 (1947), *cert. denied*, 332 U.S. 836, 68 S.Ct. 217, 92 L.Ed. 408; and *J.D. Hedin Construction Co., Inc. v. United States*, 171 Ct.Cl. 70, 86–87, 347 F.2d 235, 246–47 (1965), the defendant argues that the party seeking an equitable adjustment under the Changes clause has the burden of establishing the fundamental facts of liability, causation, and resultant injury, and that unless some actual extra cost can be attributed to an event for which the government is liable, the court should not reach the liability issue. In addition to the need to prove entitlement, the defendant argues that in seeking an equitable adjustment, the contractor has the added burden of proving: (1) causation, (2) That the amount of increased costs incurred with reasonable certainty, and (3) that there is a causal connection between causation and the particular costs allegedly incurred.

The filings submitted to the court by both parties contain conflicting and confusing discussions regarding which clause of the contract at issue should be utilized to analyze the plaintiff's individual claims. After reviewing the factual basis of each of the claims, however, this court agrees with the defendant that the claims urged by the plaintiff, if valid, arises out of either a formally directed government change order or a government action amounting to a constructive change to the contract.

The Changes clause of the WAPA contract is found in paragraph 3 of the contract's "GENERAL PROVISIONS." Paragraph 3 states in full:

a. The Contracting Officer may, at any time, without notice to the sureties, by written order designated or indicated to

be a change order, make any changes in the work within the general scope of the contract, including but not limited to changes:

(1) In the specifications (including drawings and designs);

(2) In the method or manner of performance of the work;

(3) In the Government-furnished facilities, equipment, materials, services, or site; or

(4) Directing acceleration in the performance of the work.

b. Any other written order or an oral order (which terms as used in this paragraph b. shall include direction, instruction, interpretation, or determination) from the Contracting Officer, which causes any such change, shall be treated as a change order under this clause, provided that the Contractor gives the Contracting Officer written notice stating the date, circumstances, and source of the order and that the Contractor regards the order as a change order.

c. Except as herein provided, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment hereunder.

d. If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any order, an equitable adjustment shall be made and the contract modified in writing accordingly: Provided, however, That except on claims based on defective specifications, no claim for any change under b. above shall be allowed for any costs incurred more than 20 days before the Contractor gives written notice as therein required: And provided further, That in the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with such defective specifications.

e. If the Contractor intends to assert a claim for an equitable adjustment under this clause, it must, within 30 days after receipt of a written change order under a. above or the furnishing of a written notice under b. above, submit to the Contracting Officer a written statement setting forth the general nature and monetary extent of such claim, unless this period is extended by the Government. The statement of claim hereunder may be included in the notice under b. above.

f. No claim by the Contractor for an equitable adjustment hereunder shall be allowed if asserted after final payment under this contract.

The purposes of the Changes clause have been categorized by experts in the field of government contracts as follows:

(1) To provide operating flexibility by giving the Government the unilateral right to order changes in the work to accommodate advances in technology and changes in the Government's needs and requirements.

(2) To provide the contractor a means of proposing changes to the work, thereby facilitating more efficient performance and improving the quality of contract end products.

(3) To furnish procurement authority to the contracting officer to order additional work within the 'general scope' of the contract without using the procedures required for 'new procurement' or utilizing new funds.

(4) To provide the legal means by which the contractor may process claims through the administrative disputes process.

See John Cibinic & Ralph Nash, *Administration of General Contracts* 282–83 (2d ed. 2d printing 1986).

The court in *Edward R. Marden Corporation v. United States*, 194 Ct.Cl. 799, 808–09, 442 F.2d 364 (1971), delivered a basic definition of the changes doctrine as follows:

The cardinal change doctrine is not a rigid one. Its purpose is to provide a breach remedy for contractors who are directed by the Government to perform

work which is not within the general scope of the contract. In other words, a cardinal change is one which, because it fundamentally alters the contractual undertaking of the contractor, is not comprehended by the normal Changes clause. As we said in *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956 (1965), there is no automatic or easy formula which can be used to determine whether a change (or changes) is beyond the scope of the contract and, therefore, in breach of it. 'Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole.' *Id.* at 194, 351 F.2d at 966.

*Edward R. Marden Corp.*, 194 Ct.Cl. at 808–09, 442 F.2d at 369.

Moreover, the courts have found that defective specifications issued to a contractor can trigger an entitlement to increased compensation under the terms of a government contract.

This court has frequently said that 'a contractor is entitled to an equitable adjustment under the Changes article for increased costs of performance due to defective specifications.' *L.W. Foster Sportswear Co. v. United States, supra* [186 Ct.Cl. 499] at 507, 405 F.2d [1285] at 1290 (1969). *See, e.g., Bell v. United States*, 186 Ct.Cl. 189, 200, 404 F.2d 975, 981 (1968). But, where drastic consequences follow from defective specifications, we have held that the change was not within the contract, *i.e.*, that it was a cardinal change.

*Id.* at 808–09, 442 F.2d at 369. Or, stated differently,

It is well-settled that when the Government orders a structure to be built, and in so doing prepares the specifications prescribing the character, dimension and location of the construction work, it implicitly warrants that if the specifications are complied with, satisfactory performance will result. *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63

L.Ed. 166 (1918); *Laburnum Constr. Corp. v. United States*, 325 F.2d 451, 163 Ct.Cl. 339 (1963). When, as here, defective specifications delay completion of the contract, the contractor is entitled to recover damages for defendant's breach of this implied warranty. *Laburnum Constr. Corp. v. United States, supra; Warren Bros. Roads Co. v. United States*, 105 F.Supp. 826, 123 Ct.Cl. 48 (1952); *Stapleton Constr. Co., Inc. v. United States, supra* [92 Ct.Cl. 551].

*Luria Brothers & Co. v. United States*, 177 Ct.Cl. 676, 687, 369 F.2d 701, 707–709 (1966).

Ordinarily, defendant is entitled to make necessary changes, but where the change is necessitated by defective plans and specifications defendant must pay the entire resulting damage without any deduction for time to make changes, as would be the case if the redesign were necessitated by a changed condition or the like. *See Laburnum Constr. Corp. v. United States, supra.*

*Id.*, 177 Ct.Cl. at 690, 369 F.2d at 709.

In the instant case, however, because the plaintiff seems to claim entitlement to compensation under both the Changes and Suspension of Work clauses, at least briefly, both clauses and their interrelationship must be analyzed.

Paragraph 17 of the "GENERAL PROVISIONS" of the contract at issue contains the Suspension of Work clause. Paragraph 17 states in full:

a. The Contracting Officer may order the Contractor in writing to suspend, delay, or interrupt all or any part of the work for such period of time as he or she may determine to be appropriate for the convenience of the government.

b. If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of this contract or by his or her failure to act within the time specified in this contract (or if no time is specified, within a reasonable time), an adjustment shall be made for any increase in the performance of this

contract (excluding profit) necessarily caused by such unreasonable suspension, delay, or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent (1) that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor or (2) for which an equitable adjustment is provided for or excluded under any other provision of this contract.

c. No claim under this clause shall be allowed (1) for any costs incurred more than 20 days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order), and (2) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of such suspension, delay, or interruption, but not later than the date of final payment under the contract.

The Changes and Suspension of Work clauses included in the "GENERAL PROVISIONS" of the WAPA contract are substantially the same as the Changes and Suspension of Work clauses contained in Subpart 1–76—Fixed–Priced Construction Contracts of the revised Federal Procurement Regulations. 41 C.F.R. §§ 1–7.602–3, 1–7602–32 (1983). In the appendix to 41 C.F.R. ch. 1, Part 1–7—Contract Clauses, revised as of July 1, 1983, there is a lengthy discussion of the interrelationship between the revised Changes, Differing Site Conditions and Suspension of Work clauses. In the appendix to the revised regulations, the promulgators state that, "[f]or many years problems have been encountered in the administration of these clauses." 41 C.F.R. ch. 1, Part–17 Appendix (Revised as of July 1, 1983). Therefore, following a comprehensive study, public comment and numerous revisions, the revised regulations were issued to further explain the new version of the Changes, Differing Site Conditions and Suspension of Work clauses, and to address the man-

ner in which these three clauses were intended to co-exist.

The underlying purpose of the revisions to the Changes, Differing Site and Suspension of Work clauses was the desire to facilitate administrative adjustment of claims arising under construction contracts. According to the promulgators of the revised regulations, "[i]t was believed that the elimination of 'fractionalization' problems in the handling of such cases by contracting officers, contract appeals boards, the General Accounting Office, and the courts [would] benefit both the Government and contractors." 41 C.F.R. ch. 1, Part 1–7 Appendix.

In explaining the nature of the revisions to the Changes clause, the promulgators of the revised regulations included illustrative categories which were intended to be descriptive of the kind of change actions which historically have been accommodated under the Changes clause.

The promulgators of the revised regulations wrote:

Deceleration actions not related to a change or unreasonable delay in the issuance of a change order were intentionally omitted since they are in the nature of a suspension, delay, or interruption covered by the Suspension of Work clause, which is now made a mandatory clause. Hence, it is not intended that the Changes clause cover actions which (i) are clearly denoted as a suspension order or (ii) have as a primary purpose the effecting of a suspension, delay, or interruption of work.

41 C.F.R. ch. 1, Part 1–7 Appendix.

The promulgators, however, went on to write that, "[a]n equitable adjustment clearly encompasses the effect of a change order upon any part of the work, including delay expense; provided, of course, that such effect was the necessary, reasonable, and foreseeable result of the damage." *Id.*

Regarding the revised Suspension of Work clause, the promulgators of the revised regulations also stated:

The Suspension of Work clause has been revised to coordinate its text with that

the Changes clause as revised. The principal revisions in the Suspension of Work clause are as follows:

\* \* \* \* \* \*

For clarification, the second sentence of the clause [Suspension of Work] as revised specifically indicates that an adjustment is not to be made under the clause in any instance where 'an equitable adjustment is provided for or excluded under any other provision' of the contract. Accordingly, where a claim for delay expense is cognizable under the Changes clause or the Government–Furnished Property clause, for example, an adjustment will be for consideration under these clauses in preference to the Suspension of Work clause.

41 C.F.R. ch. 1, Part 1–7 Appendix.

The contract provisions, as revised, and as explained in the Appendix to 41 C.F.R. ch. 1, Part 1–7, make it quite clear that where a conflict between the Changes and Suspension of Work clauses exists, the claims should be resolved under the Changes clause. Therefore, it is appropriate, as suggested by the defendant, to evaluate plaintiff's claims under the applicable Changes clause.

■ When a contractor performs work beyond the work required under the contract, but without a formal change order, and it is perceived that such work was informally ordered by the government or caused by fault on the part of the government, a constructive change can be found to have occurred. John Cibinic and Ralph Nash, *Administration of Government Contracts* 320 (2d Ed. 2d printing (1986)); *see also Len Co. & Assocs. v. United States*, 181 Ct.Cl. 29, 39, 385 F.2d 438, 443 (1967). The constructive change doctrine is accepted by this court as well as its predecessor, the United States Court of Claims. *See Lathan Co. v. United States*, 20 Cl.Ct. 122, 128 (1990) (citing *Chrisbes [Chris Berg], Inc. v. United States*, 197 Ct.Cl. 503, 525, 455 F.2d 1037, 1050 (1972)). One of the purposes of allowing constructive changes is to ensure that the contractor will proceed with the work pending resolution of disputes for which redress is available under the Changes clause. *See* John Cibinic & Ralph Nash, *Administration of Government Contracts* 321 (2d Ed. 2d printing 1986).

■ To recover under the changes clause of the contract, based on a directed or constructive change for work beyond that required by the contract, it must be clear that:

... each of the other elements of the standard 'Changes' or 'Extras' clause has been present—the contracting officer has the contractual authority unilaterally to alter the contractor's duties under the agreement; the contractor's performance requirements are enlarged; and the additional work is not volunteered but results from a direction of the Government's officer.

*Len Co. & Associates*, 181 Ct.Cl. at 38, 385 F.2d at 443.

The court in *Sterling Millwrights, Inc. v. United States* clearly articulated the grounds for prevailing on an equitable adjustment claim pursuant to the Changes clause in a government contract:

A contractor may seek an equitable adjustment to compensate for increased costs of performance flowing from changes that alter the work to be performed under the contract. To prevail on its claim for equitable adjustment(s), plaintiff must demonstrate first that any increased costs arose from conditions differing materially from those indicated in the bid documents, and that such conditions were reasonably unforeseeable in the light of all the information available to the contractor. Plaintiff must also show that its contract costs actually increased, and that the cost increases were the direct and necessary result of the change.

*Sterling Millwrights, Inc. v. United States*, 26 Cl.Ct. 49, 72 (1992) (citations omitted).

The courts also recognize that a contract change can and does create costs beyond those attributable to the changes themselves:

Under the Changes clause, plaintiff can recover delay damages as compensation for extended performance due to the change. *Pathman Constr. Co. v. United States*, 227 Ct.Cl. 670, 673 [652 F.2d 70] (1981); *Merritt–Chapman & Scott Corp. v. United States, supra*, 192 Ct.Cl. [848] at 851, 429 F.2d [431] at 432; *Paul Hardeman, Inc. v. United States, supra*, 186 Ct.Cl. [743] at 749–752, 406 F.2d [1357] at 1361–1363.

*G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 699 (1984).

As stated in *Len Company & Associates v. United States:*

> Where such a clause (or a comparable one) is included, we, as well as the Armed Services Board of Contract Appeals, have held that, if a contracting officer compels the contractor to perform work not required under the terms of the contract, his order to perform, albeit oral, constitutes an authorized but unilateral change in the work called for by the contract and entitles the contractor to an equitable adjustment in accordance with the 'Changes' provision.

181 Ct.Cl. at 38, 385 F.2d at 443.

■ Under the contract provisions which provide for an equitable adjustment, damage awards to contractors are calculated based upon the difference between the reasonable cost for performing the work as changed and the reasonable cost for performing the work according to the original contract specifications. *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 704, 412 F.2d 1360, 1370 (1969) (citing *Bruce Construction Corp. v. United States*, 163 Ct. Cl. 97, 101–02, 324 F.2d 516, 519 (1963)).

In a number of extensive and complex contract cases, including the one at bar, exact computation of damages may prove to be extremely difficult. Therefore, courts have held that, "[t]he ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage *is* clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision. It is sufficient if the evidence adduced is sufficient to enable a court or

jury to make a fair and reasonable approximation." *Electronic & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969) (citations omitted, emphasis in original). "It is sufficient if he [plaintiff] furnishes the court with a reasonable basis for computation, even though the result is only approximate." *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965); *see also Capital Electric Co. v. United States*, 729 F.2d 743, 746 (Fed.Cir. 1984); *Jackson v. United States*, 12 Cl.Ct. 363, 366–67 (1987); *Addison Miller, Inc. v. United States*, 108 Ct.Cl. 513, 557, 70 F.Supp. 893, 900, *cert. denied*, 332 U.S. 836, 68 S.Ct. 217, 92 L.Ed. 408 (1947). However, "leniency as to the actual mechanics of computation does not relieve a contractor of its basic and essential burden of establishing the fundamental facts of liability, causation, and resultant injury." *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. at 737 (1984).

In *J.D. Hedin Construction Co. v. United States*, 171 Ct.Cl. 70, 86–87, 347 F.2d 235, 246–47 (1965), the court addressed a situation in which liability was established, but the amount of damages remained uncertain. Stating its dislike for the total cost method of computing damages, but citing to a number of prior cases in which such method has been employed, the *Hedin* court, nonetheless, indicated that:

> However, we have used this method [total cost] under proper safeguards where there is no other alternative, since we recognized that the lack of certainty as to the amount of damages should not preclude recover. *Oliver–Finnie Co. v. United States*, 150 Ct.Cl. 189, 279 F.2d 498 (1960); *MacDougald Construction Co. v. United States*, 122 Ct.Cl. 210, (1952); *The Great Lakes Dredge & Dock Co. v. United States*, 119 Ct.Cl. 504, 96 F.Supp. 923 (1951), *cert. denied* 342 U.S. 953 [72 S.Ct. 624, 96 L.Ed. 708] (1952). In all these cases the fact of government responsibility for damages was clearly established; the question was how to compute reasonable damages where no other method was available. *River Con-*

struction Corp. v. United States, supra, at 271. We think this is such a case. The exact amount of additional work which plaintiff had to perform as a result of the foundation problem is difficult, if not impossible, to determine because of the nature of the corrective work which was being performed. The adverse weather conditions during the extended period in which the excavations remained open caused a myriad of problems. Additional trenching, form construction, and pumping of surface water became necessary. Re-excavation by hand was sometimes required. The extreme muddy conditions caused difficulties and slowed down performance. There is no precise formula by which these additional costs which plaintiff would have incurred if there had been no government-caused difficulties. However, the reasonableness and accuracy of plaintiff's estimate, which was prepared by an experienced engineer whose qualifications have been unchallenged, have been established. Defense counsel stated that the estimate was not challenged.

*Id.* The *Hedin* case bears a number of striking similarities to the instant case, and is instructive regarding the situation before the court.

This non-exact method of calculating damages has been likened to the jury approach of reaching a final award amount. In *River Construction Corporation v. United States*, the court stated:

On occasion the court has followed a jury verdict approach in computing damages. *Penker Construction Co. v. United States*, 96 Ct.Cl. 1; *Needles v. United States*, 101 Ct.Cl. 535, 618; *Chalender v. United States*, 127 Ct.Cl. 557, 566 [119 F.Supp. 186]; *Western Contracting Corporation v. United States*, 144 Ct.Cl. 318. In all of these, and other cases which could be cited, the fact of damage was established and the responsibility of the defendant for it, and the question was how to compute reasonable damages from the evidence at hand.

*River Constr. Corp. v. U.S.*, 159 Ct.Cl. 254, 271 (1962).

■ Under this approach to calculating damages: "The claimant bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." *Willems Indus., Inc. v. United States*, 155 Ct.Cl. 360, 376, 295 F.2d 822, 831 (1961) (citing *Winn–Senter Constr. Co. v. United States*, 110 Ct.Cl. 34, 63, 75 F.Supp. 255 (1948)), *cert. denied*, 370 U.S. 903 [82 S.Ct. 1249, 8 L.Ed.2d 400] (1962).

■ This court, likewise, is not fond of the total cost method of computing damages. The court finds, however, that, after sitting through the lengthy trial, reviewing the volumes of documentary evidence, including engineering drawings and charts, the extensive trial testimony, and given the nature of the claims in the instant case, the jury verdict or total cost method for calculating damages should be applied to those claims for which the court has found liability in this Opinion, or for which the defendant has conceded liability. The court in *G.M. Shupe v. United States* recognized that certain difficult cases presented appropriate circumstances for resort to the total cost damage calculation methodology as follows:

Under the difficult circumstances of this litigation, the court took a balanced approach relative to the above proposition in order to arrive at what it considered a fair award based upon the record in this case.

In reaching damage conclusions in its discussions of the various claims presented by plaintiff, the court has utilized the calculations, along with others not disputed by the parties, set forth above in determining the amount plaintiff is entitled to recover as an equitable adjustment.

*G.M. Shupe*, 5 Cl.Ct. at 737. Partial recovery in the instant case is clearly appropriate and should not be avoided at this juncture.

I. Structure Height Changes—Change Order A001

The contract at issue required ALB to remove an existing 188 mile 161kV, wood pole, H-frame transmission line in its entirety, to furnish all materials and to construct a new single circuit, 3–phase wood-pole, H-frame, 230kV transmission line, approximately 180 miles in length. In a letter dated February 4, 1984, WAPA issued to ALB its "Formal Notice to Proceed with the work designated Part A in paragraph 1.1.3, entitled Commencement, Prosecution, and Completion of Work." ALB received a notice to proceed with on-site work from Havre to Malta (Part B), by letter dated February 15, 1984.

During the months of February and March, and part of April, 1984, ALB began performance on the contract. During this period, ALB subcontracted with the John C. Taylor Lumber Co. (Taylor Lumber) to supply, to treat and to deliver to holding areas, and to points along the project route, all wood poles required to be furnished under the contract. Taylor Lumber began delivering poles in March 1984. Moreover, ALB began to mobilize equipment, materials began to arrive, and ALB began placing work crews at the various sites.

On April 13, 1984, the defendant issued Change Order A001, pursuant to Clause 3 of the Changes clause of the General Provisions of the contract. Change Order A001 contained the following narrative language:

### FORT PECK–HAVRE 230–kV TRANSMISSION LINE

a. Electrical Clearance Standards require changes in the height of 112 structures. The Contractor is hereby directed to furnish structures in accordance with the attached revised structure listing.

b. The foregoing changes shall be definitized and a Supplemental Agreement to the contract will be negotiated to provide an equitable adjustment in the contract price. Said definitization shall be accomplished within thirty (30) calendar days after receipt of this Change Order.

c. Funds in the amount of $25,000 are provided for this change and shall not be exceeded.

Based upon testimony at trial, regarding the background of Change Order A001, WAPA's Contracting Officer's Technical Representative ("COTR") for the project, Robert Jones, stated he first learned of Change Order A001 from WAPA's transmission line designer, Bob Elmgreen, on April 6 or 7, 1984. Elmgreen told COTR Jones that WAPA had found problems with conductor clearance on the high side profile which would not meet National Electric Safety Code standards for conductor ground clearance. Alan Peschong, WAPA's Chief of Construction instructed COTR Jones not to notify ALB immediately because WAPA had not fully defined the extent of the problem. WAPA's design department and COTR Jones discussed whether to analyze the section of line ALB was working on first and let ALB know of the changes that would be affecting ALB immediately, but decided instead to analyze the entire 180 miles of the project before contacting ALB. COTR Jones admitted during cross-examination that he had the authority to advise ALB that it may have been delivering poles to the sites which would be the wrong size, but he did not do so.

By letter dated April 23, 1984, WAPA removed 6 structures from Change Order A001, making height change to a total of 106 structures. By letter dated April 25, 1984, WAPA added 3 structures to Change Order A001, resulting in a net change to 109 structure heights under Change Order A001.

On April 24, 1984, WAPA wrote ALB a letter requesting price quotations for 9 structure types and submission of any other costs to be incurred by ALB associated with Change Order A001. In response, on April 30, 1984, ALB wrote WAPA stating that additional costs would substantially exceed the $25,000.00 WAPA had obligated for Change Order A001. ALB advised WAPA that some completed construction would have to be redone, that ALB was concerned about the procurement of mate-

rials and timely availability of the 233 longer poles required by Change Order A001, and that ALB would be experiencing delays in the receipt of poles not part of the change, as a result of the impact of Change Order A001 on the supplier's entire production system. Furthermore, ALB stated that anticipated total additional costs from Change Order A001 would be in excess of $600,000.00. In relevant part, ALB's April 30, 1984 letter states:

\* \* \* \* \* \*

Our additional costs as a result of this change are now approaching $25,000 which has been obligated and it is clearly evident that these additional costs will substantially exceed that amount. In addition to completed phases of the construction which will have to be redone, we are concerned with the procurement of materials—primarily the cost and availability in a timely manner of the 233 longer poles....

Our pole supplier, after receiving notice, moved immediately to initiate the change into his production system. However, we are experiencing delays not only in receipt of the longer poles but also poles which were not changed, as a result of the impact which this change has had on our supplier's entire production system.

This will obviously have a great effect on our schedule and job cost. We anticipate that our total additional costs as a result of this change order will be in excess of $600,000. We are now definitizing these costs for submittal.

\* \* \* \* \* \*

On May 9, 1989, the defendant filed a "Statement of Admission of Liability" in which it acknowledges liability, to a limited extent, for certain of the plaintiff's 12 claims. In its admission of liability, the defendant admits liability in the amount of $24,877.95 for the additional work required of the plaintiff as a result of government Change Order A001, structure height changes. In plaintiff's filing, however, styled "Plaintiff's Claims Summary," the amounts claimed for each of plaintiff's 12 claims is outlined. For claim number 1, the plaintiff asserts that WAPA is liable for an additional $197,722.00 as a result of Change Order A001.[11]

Through the presentation of a number of credible witnesses, including the brothers Frame, David, President of ALB, and Ralph, who worked for ALB in a variety of jobs, including Subcontractor and Project Superintendent for Stringing and Removal Operations, Barney Olberg,[12] President of Taylor Lumber, Warren Sorenson,[13] and Steve Stark, an experienced pole hauler, plaintiff presented a coherent and cogent picture of the impact of Change Order A001 on the project. Through these same witnesses, plaintiff also presented credible testimony and documentary evidence regarding the time lost from the initial "as-planned" schedule, and suggested reasonable ways for calculating damages. Defendant did not, either in its case on direct, or during cross examination, defeat the credibility of plaintiff's factual narrative and provided little alternative theory to defeat plaintiff's claims.

Change Order A001 was an extensive modification to the WAPA contract which,

11. None of the documentation submitted by the parties indicates whether the amounts claimed by the plaintiff in its "Claims Summary" include or are in addition to the amounts the government admits liability for in the "Statement of Admission of Liability." For example, in its statement of liability for additional work as a result of Change Order A001, the defendant acknowledges liability in the amount of $24,877.95 and indicates that it has already paid the plaintiff $12,470.00 of that amount. The plaintiff's subsequent claim summary, however, indicates that ALB is seeking $197,722.00 for increased costs resulting from Change Order A001; yet, there is no indication in that filing, or any other document before the court, whether the $197,-722.00 includes or is in addition to the $24,-877.95 to which the government has admitted liability.

12. In 1983 and 1984, at the inception of Fort Peck–Havre project, Mr. Olberg was Vice President and General Manager of the wood preserving division at Taylor Lumber.

13. Warren Sorenson has been in the electrical construction industry since 1958. He has been employed by ALB since 1984. At the time of trial, he was the stringing superintendent for ALB in Hawaii.

in turn, affected numerous aspects of ALB's operations. Warren Sorenson testified that he had never seen a change order as large as A001. The plaintiff has claimed entitlement to an equitable adjustment for the effects of Change Order A001 on: the pole haul operation, on the ground framing crew, the cross-arm and insulator crew, the digging crew, setting crew and the staking operation.

### 1. The Effect of A001 on the Pole Haul Operation

Plaintiff offered the testimony of Steve Stark, an individual with approximately twenty years experience in the timber industry, to document the effect that Change Order A001 had on the pole hauling operation. Over the years, Stark had performed the duties of a logger, pole hauler and, beginning in 1984, he worked for ALB performing various jobs from groundman to job superintendent. On the Fort Peck–Havre project, Stark performed the duties of pole hauler. The court found Steve Stark to be both extremely knowledgeable about the timber industry, as well as regarding pole hauling operations. Overall, the court found him to be a very credible witness.

Steve Stark stated that the delivery of poles on the Fort Peck–Havre transmission line project started south of Chinook, Montana, in mile 154 and moved in a westerly course toward the Havre substation. Although Stark could not say with absolute certainty that prior to the issuance of Change Order A001, there were no skips along the construction route, he did not remember any such skips. Stark testified at length as to the manner in which the poles were delivered on the project. To get to each structure, he testified that he used a public road, then an access road and from there made his way to the center line right-of-way and proceeded down the right-of-way, in whichever direction he needed to go. Depending on the terrain, Stark averaged between six and seven structures on each truck haul, equivalent to 14 to 15 poles. The staking sheets Stark received from ALB indicated what poles he needed to drop off at each site. The pole manufac-

turing plant also had the staking sheets, and both Stark and the plant worked together using the same information. Stark coordinated incoming truck shipments of poles. The plant generally sent pole shipments which covered 15 to 20 sequential structures. The plant knew where the poles would fit, and each new shipment was delivered where the last one left off. The plant would call Stark the night before a truck would leave the treating plant. The trucks were in transit for an average of two days. Steve Stark would then, in coordination with a map provided by ALB, and after a physical tour of the access roads, deliver the poles to the designated destination. Stark testified that he delivered the poles as fast as they came in and did not experience a problem in delivering the poles to the structure sites once he received them. The problem encountered was in getting delivery.

The testimony of both Barney Olberg and Warren Sorenson indicated that due to the numerous pole height changes associated with Change Order A001, the pole treatment plant faced the dual problems of a lack of poles in sizes required by the modification, and getting the right size poles to the project in the newly configured pole sequence. In an effort to satisfy the pole requirements associated with Change Order A001, Taylor Lumber had to trade some poles with other treating plants, as well as to log new trees. Olberg testified that obtaining the longer poles associated with Change Order A001 presented the most difficulty because for every ten feet added to the pole length, the difficulty doubled.

Steve Stark testified that after Change Order A001 was issued, he could no longer sequentially deliver poles along the transmission line construction route. In addition, Stark stated that as a result of Change Order A001, he had to retrieve poles which had already been delivered to individual sites. On several occasions, Stark could not pick up the old poles because they were still framed. Therefore, he had to wait for the ground framing crew to return to the site and dismantle the

structure, before he could return to the structure site again to pick up the old poles, haul them to his yard, return them into his inventory and redistribute them. Furthermore, Change Order A001 created a shortage of poles, and generated skips on other structures in addition to those affected by Change Order A001. The revised procedure developed by Stark to address the problems created by Change Order A001 often required two to three return trips to a site before the poles required by Change Order A001 could be put in place. Steve Stark testified that, but for the cultural site and Change Order A001 problems, he could have delivered all the poles by August 1984. Instead, the pole haul operations lasted 8 months, and pole delivery was not completed until mid-November 1984.

Ralph Frame testified that the methodology he used to calculate the extra days necessary to complete the portion of the project from mile 154 to 169 was to determine the actual number of days worked on a particular subsection of the project affected by the WAPA directed Change Order, then to divide that number by the production rate achieved in an unaffected area to determine how many days it should have taken to do the affected subsection. The court finds this to be a reasonable method of computation. His lengthy testimony was highly credible. He appeared knowledgeable and to have done extensive preparatory work, based on correct assumptions and review of the specific facts of the site to make the court believe that his quantification regarding the impact of the government ordered changes was accurate and fairly derived.[14]

For example, in the area between mile 154 and mile 169, the pole haul operation was affected by Change Order A001 in the following ways. WAPA changed the structure heights on three HSB-type structures and three 3AC structures which had already been ground framed in this area. Based on testimony presented by Steve Stark at trial, the pole hauler required 5 extra days to do the change-out work between mile 154 and mile 169.

**14.** In order to price the costs of loss of efficiency of ALB's operations as a result of Change Order A001, Ralph Frame compared the costs and time to do the work in the area of the project affected by the change orders versus the unaffected areas of the project. In *Houston Ready–Cut House Co. v. United States,* 119 Ct.Cl. 120, 96 F.Supp. 629, 639 (1951), the court was faced with a situation similar to the one at bar, and used a comparison of unit costs to calculate damages. In the *Houston Ready–Cut House Company* case, the court wrote:

> We come, then, to the problem of determining the amount of damages, to which plaintiff is entitled because of the interference and delay occasioned by defendant's breach of contract. As a result of defendant's breach, plaintiffs were forced to depart drastically from their usual orderly procedure and to work haphazardly about the project as building sites became available and accessible. Building parts were stockpiled instead of being delivered directly to building sites. House panels were handled and rehandled before they were finally incorporated into houses, and each handling took its toll in breakage. The project ran on into the winter months and damage to stockpiled materials from winter rains was severe. At the same time, it is apparent that another cause of stockpiling rather than delivery direct to sites was that plaintiffs were not able, at least until the middle of August, 1942, to deliver complete house units due to shortages of certain components and to the wartime 'freeze' on motor transport. Complete carloads of certain types of panels would be shipped by rail and stockpiled awaiting the arrival of other panels necessary to the erection of a complete unit. The stockpiling was inefficiently handled and inadequate steps were taken to protect the stored panels until late in October 1942.

> The end result was that plaintiffs, in order to complete performance under the contract, were obliged to ship some $41,447.36 worth of excess material to the project and to expend $92,690.28 for excess labor, to which must be added $8,418.71, representing payroll taxes and insurance upon the foregoing. The contract lagged 280 days behind schedule, and a portion of plaintiffs' overhead expenses during this period was properly chargeable to the Hooks project. *Grand Trunk R. Co. v. W.H. Nelson Co.,* 116 F.(2d) 823; *McCloskey, Inc. v. United States,* 66 C.Cls. 105. Team hire caused an extraordinary expense of $1,507.50, and about $2,000.00 in excess of normal requirements had to be expended for truck hire. *Id.* at 191, 96 F.Supp. at 637–38. Although such a comparison cannot be expected to yield perfect accuracy, " 'absolute certainty as to the amount of the damages is not essential, this being a matter for determination according to the circumstances of each case.' " *Houston Ready–Cut House Co. v. United States,* 119 Ct.Cl. 120, 193, 96 F.Supp. 629, 639 (1951).

According to Ralph Frame, as a result of the supplier's difficulty in recovering from the Change Order A001 at the treatment plant, there was a significant delay in the delivery of poles. This impacted ALB's construction operations as the delivery of poles became the critical pacing element for the project, instead of the ground framing operation. The situation became so complex that, for example, in late April or early May, 1984, Steve Stark went back to the plant for four or five days to help develop a recovery plan. By the time Stark came back from the plant and hauled structures to replace those for work which had already been performed, the ground framing operations had caught up to him in the 169 mile area. In addition, the treatment plant took about 28 days before they made their initial recovery. The pole hauler no longer had the necessary poles available for every structure down the line in a lineal, sequential manner, and, therefore, had to skip sites along the way. According to Steve Stark, the difficulty in getting pole deliveries also caused skips in structures later on in the project which had not been changed by Change Order A001. According to Ralph Frame, in many cases, structures which were skipped by the pole haul crew, were also skipped by the ground framing operation, although the pole hauler did what he could to try to keep his operation ahead of the other crews in order to minimize the overall impact of Change Order A001 on the project.

In the area between miles 169–178, there was so much skipping necessitated by Change Order A001 that it was difficult to calculate the extra time worked at each structure. However, Ralph Frame attempted to calculate the extra time by taking the rate which the pole hauler actually achieved between miles 169 and 170 and comparing that rate against an unaffected area from the rest of the project. Under this calculation, the pole hauler incurred 6.25 extra days between miles 169 and 178 for skipping and returning to structures to perform work. In addition, the pole hauler lost 12 production days because he did not have poles to deliver.

Because of the structure height changes included in Change Order A001, the pole hauler was requested to resort, rehandle, and rehaul poles designated for other structures to new sites. Change Order A001 also resulted in excess poles at some sites, and the need for some poles to be relocated as a result of the changes. This required the pole hauler to return to the site to pick up the excess poles and haul them to other yards along the route. Because of the size of the structures and the limited number of three-pole 3AC structures required along the entire project route, the pole hauler actually picked up these poles and hauled them through several staging yards, until he finally found a home for them in the Malta area. The time lost for this extra work was 4 days.

According to Ralph Frame, the next impact area occurred in miles 137 to 142, just south of Zurich. Here, the pole supply plant could not furnish necessary materials. The pole hauler lost 4 days in this area because he had no poles to deliver to the line, thereby hindering his ability to perform the work required.

The pole hauler was also affected at structures 130/6 and 130/7, just south of Harlem. These two structures required 90–foot poles that were shipped by rail. When the pole hauler was delivering poles in the area, he had to skip these two structures. Eventually, the rail shipment delivery came into the Savoy area. At that time, the pole hauler was working out of Harlem. In order to deliver the poles to the designated structure sites, the pole hauler had to come down 9 or 10 miles from Harlem to Savoy, load the poles, go back to Harlem, and deliver the poles to the structure site on the north side of the Milk River. Then, he had to go back around to the north, and to the west a couple of miles, in order to cross the Milk River, then 3½ miles down along the south side of the river to deliver poles at the other side. There were 6 or 7 gates which the pole hauler had to open and close for access, which resulted in slow travel. By the time the pole hauler picked up the poles at Savoy and returned to Savoy after delivery of the poles, it had taken him 1 full day to do

the work. Between mile 51, south of Saco and mile 124, there were additional delays also due to the pole haul operations. These involved 6 structures with longer poles which had been delayed by the rail shipments. The pole hauler required 3 extra days to haul the structures that he had to skip initially.

### 2. The Effect of A001 on the Ground Framing Crew

According to Warren Sorenson, another knowledgeable, credible witness presented by the plaintiff, the ground framing crew was similarly affected by Change Order A001, and more specifically by the lack of poles resulting from Change Order A001. The framing crew could not move in their normal production process for a variety of reasons. First, since some structures had already been framed, the ground framing crew had to return to disassemble the old structure, frame the new structure, and put the new structure in place. Second, the framing crew had to skip structures. This was particularly time consuming when the crew had to skip more than one structure, which required the framing crew to load up the old jacks on the trucks, wind up all the cords, and make the truck roadworthy.

As described by Ralph Frame, in the area between mile 154 and 163, the poles affected by Change Order A001 were located between miles 155 and 163. After the ground frame crew framed these structures, Change Order A001 was issued. Consequently, the crew had to change out the structures which they had previously framed because the new structures were generally about five feet taller. Of the structures in the area, there were the three-pole type structures, which required less work than the HSB structures. The HSB structures required the ground framing crew to physically return to and re-move the cross-arms, and all the hardware, followed by putting the cross-arms on the new poles.

As a result of Change Order A001, including insufficient poles to proceed on five separate occasions during the summer months, the second ground framing crew was constantly disrupted in their activities. As a result, the second ground framing crew was not able to achieve the same production rate achieved by the first framing crew.[15] The interruptions also extended the framing operations into winter, and, therefore, affected overall production. The number of days that they did not work during that period because they were starting and stopping was 40 work days.

Ralph Frame testified that to develop his calculations he used information taken from the time cards, from which it is possible to identify the structures completed by the first frame crew each day and the time required. By simply dividing the 950 structures framed by the first crew by the 148.38 days required to complete those structures, Ralph Frame determined that the crew averaged 6.4 structures framed per day. To calculate the production for the second framing crew, Ralph Frame testified that he used the 246 structures the crew actually framed, from the 154 mile area to the 32 mile area, where the crew hit the cultural resources site restrictions in the 32 mile area, and the number of days actually required of them to frame the 246 structures. They framed 246 structures in that area and worked 53 days to do it. The resultant 53 day production rate of the second frame crew then was divided by the rate which could have been achieved by the first framing crew, about 38 days, which Ralph Frame subtracted to determine the lost time or the reduced production for the second frame crew. The court notes that both crews used identical equipment between Chinook and Malta for all the work

15. The first ground framing crew is the crew that worked during the entire period of contract performance. In Ralph Frame's calculation of the additional costs incurred by ALB in regard to the effect of Change Order A001 on the ground framing operations, the first ground framing crew represents that part of the equa-tion unaffected by the change order. The second crew worked at intermittent time periods from the Chinook area, mile 154, to the Richardson Coulee area, mile 28, and represents that part of the equation affected by Change Order A001.

that was done. From Malta to the cultural resource site in the 132 mile area, the crews used different equipment, the "framing buggy," because the daylight hours were becoming shorter, and it was not possible to keep the same type of operation going. To compare the effect of equipment on the second framing crew, Ralph Frame compared the production rates between Chinook and Malta for the second framing crew against what they were able to achieve between Malta and Richardson Coulee. The two rates were surprisingly close, practically identical production rates were achieved by the second framing crew using the two different types of equipment. Consequently, the effect of stopping and starting on the second framing crew was an additional 14⁴/₁₀ days.

### 3. The Effect of A001 on the Cross–Arm and Insulator Crew

Change Order A001 also affected two additional operations, the cross-arm and insulator crew. While the same crew performed both operations, they performed two separate and distinct functions in that the cross-arm operation immediately followed the pole deliveries, and the insulators immediately followed the framing activity. Ralph Frame testified that the structure change-outs in the mile 154 to 165 area affected the cross-arm crew by ½ a day. Moreover, following Change Order A001, in the area from 163 to 176, the cross-arm delivery crew preceded the pole haul operation. Therefore, they had to leave cross-arms in areas where there were not any poles. Normally when the pole hauler set down the poles, he would have deposited them in the way that they were going to be used, parallel to each other. The cross-arm crew would then set the cross-arms on top of the poles in the position handy for the ground framing operation when they come through. Because there were no poles available, the cross-arms were left nearby so as not to generate a skip in the cross-arm delivery. Therefore, the cross-arm crew had to come back and perform the work. It took the cross-arm crew 1 day to come back, pick up the cross-arms and set them onto the poles.

### 4. The Effect of A001 on the Digging Crew

According to Warren Sorenson, the digging crew worked in front of the setting operation, and was responsible for digging the holes used by the setting crew when they set the structures. The diggers could not get too far ahead of the setting operation because if it rained before the setting crew arrived at the location, then the digger would have to return to re-dig the hole. The digging crew began operations in Chinook at mile 154 and progressed westerly until they reached the Havre substation at mile 178. Due to the lack of poles at certain structures along the way, as a result of Change Order A001, the digging crew skipped the structures without poles and continued on until they reached the substation. After the digging crew reached the Havre substation, it returned along the route, picking up the skips. Ralph Frame testified that the additional work performed by the digging crew associated with having to return to certain structures along the line required 2.75 additional crew days.

Defendant has argued that because ALB was apprised of the changes in the pole structures by the time the digging crew began operations, that there was no reason ALB did not dig the holes to the proper depth the first time it went through the area. According to the defendant, the decision to skip a site where there were no poles was at the election of ALB and should be found to be unrelated to Change Order A001. Defendant, therefore, argues that ALB is not entitled to extra digging costs. The record demonstrates that the digging crew skipped structures where there were no poles and had to return after the poles were delivered and framed, and that it would not have been practical for the crew to dig holes where there were no poles. By the time poles were delivered, the digging crew would have had to return to re-dig and clean out the slough for holes that had been dug and exposed to the elements for an extended time. Accordingly, this court finds the plaintiff's course of

action to have been prudent, and the claim for 2.75 additional crew days to be reasonable and supported.

### 5. *The Effect of A001 on the Setting Crew Operations*

According to Warren Sorenson, the setting crew (also called the erection crew) developed a production line process similar to the ground framing crew. The setting crew would set the pole structures in the hole, tie them off, and get the poles ready to tamp. The crane operator and two men would then go to the next structure and start putting up the spreader bar and tag the ropes on the poles. By the time the remaining portion of the crew arrived at the new structure, the crane and crew were ready to plumb the structure, disconnect the crane and move on to the next structure.

Change Order A001, and the skips it generated, prevented the setting crew from utilizing their normal production process. Due to the skips along the line, the setting crew incurred additional work in order to compensate for the deviation from their normal schedule. For instance, normally the setting crew would simply drag their setting ropes behind a pickup from one structure to the next, however, where there was a long distance in between structures due to the skips between structures, the crew had to make the equipment road worthy. In addition, the crew lost the advantage of having the crane travel ahead, since the crane had to be made road-worthy, it traveled at a slower rate, and the second crew would arrive at the next structure simultaneously with the crane crew. In addition, the crew on the crane had to secure the spreader bar to the cross-arms or back to the crane because they could not let the spreader bar "dangle" in front of the boom, as would be the case if the crews were moving sequentially along the line. Ralph Frame testified that the setting crew progressed in the same manner as the digging crew, proceeding westerly from mile 154 to the substation at mile 178, and then returning to pick up skips as they headed east, back toward mile 154. Ralph Frame further testified that, based on his review of the documentation in the case, the setting crew incurred 3.88 extra days of work.

In the defendant's "Response to Plaintiff's Post Trial Memorandum," the defendant, albeit not very clearly, attempts to respond to plaintiff's claims for the effects of Change Order A001 on the setting crew operations by finally offering its own computations on the number of days of work lost. Defendant makes a number of general assertions, such as "ALB often overstated in its time cards the extra work performed by its crews because it failed to deduct the time it took to perform bid work." The defendant, however, produced very little evidence on the issue of the time loss as a result of Change Order A001 at trial, and in fact requested the time cards for analysis only after the trial had been completed. Therefore, for the first time, in the "Defendant's Response to Plaintiff's Post Trial Memorandum," defendant contends that the dates on which ALB claims it performed extra work do not clearly reflect what work was extra work and what work was bid item work. Defendant's assertions such as, "ALB's time cards for June 4, 1984, show that they may have been modified or altered to reflect that the crew spent six and one-half hours performing extra work," are not backed up by testimony in the record. In fact, much of the analysis submitted in defendant's brief is counsel's analysis, not unsupported by testimony of government or ALB witnesses who were present at, or involved in the construction job at issue.[16]

---

**16.** For example, defendant's counsel also incorrectly conceded to compensate ALB for work done at structure 175/7, an item for which plaintiff was not making a claim. In addition, defendant's counsel was incorrect when she argued that structure 170/5 was skipped on May 15, 1984 because the holes caved in. In fact, ALB's claims for work performed at structure 170/5 was because this structure required 90 foot poles which had been delayed in rail shipment from the plant as the result of the effect of Change Order A001 on the plant's pole production. Likewise, defendant's counsel misinterprets ALB's claim for extra setting work on June 7, 1984, by arguing that ALB spent only 1.66 hours traveling to and from the structures erect-

From the record, including the testimony of Ralph Frame, it is clear that the time cards alone do not give a complete picture of the claim submitted by ALB. Ralph Frame testified that field workers did not always recognize extra work and they could not calculate the amount of reduced production/lost efficiency they experienced as a result of WAPA's changes and actions. Moreover, according to the testimony of Ralph Frame, which is supported by the record, it appears that ALB did subtract bid item work time from the hours claimed contrary to WAPA's assertions.

The court realizes that the trial record, including the record on the impact of Change Order A001 on the setting crew, is long, complex and replete with numerous cumbersome exhibits, including boxes and boxes of time cards. However, even following completion of the trial, the defendant failed to adequately respond to plaintiff's claims for compensation. Defendant's counsel's post-hoc numerical analysis appears to be based on assumptions and guestimates which are too speculative. More important, what trial testimony is contained in the record suggests that the defendant based its conclusions on a very limited sampling of the data presented in the trial record, as opposed to the careful analysis undertaken by Ralph Frame and the much more thorough presentation of the evidence by the plaintiff, ALB.

In response to a question from defendant's counsel at the trial as to how he had arrived at evaluated his position with regard to the loss of efficiency of the crews, COTR Jones described his analytical process, as follows:

I took each of the crews that were impacted under the 83 page document [Exhibit 1179, Analysis of Claim No. 1 for Additional Costs on Mod. A001 prepared by Robert Jones] and attempted to find five days in the immediate vicinity of when they worked and where they worked that were not affected by any other factors.

By any other factors I mean other structures in the area that were affected by A001 of the cultural resource sites or the delayed right-of-way.

In that evaluation if there was a rain day where they were mudded out or if on the case of the erection crew, where there was a day that they were blown out because of strong winds and couldn't erect, I did not use those days.

I attempted to use very representative time frames for the crews. The reason I only used *five* days in the immediate vicinity of the affected area is because of *hopefully* the same number of people on the crew and the same people with the same degree of efficiency.

And I determined what their average efficiency was for those five days. And when I looked back to the affected area in our 83 page document and applied that average efficiency to the crews that were working at the time on the site.

\*　　\*　　\*　　\*　　\*　　\*

Well, there could have been a year and a half on the project but I used five days in the immediate vicinity of say its affected structure site.

And I threw out days where they did not have full production or there was something else that would affect their days on that time period.

THE COURT: But it is five days out of a total of perhaps 450 days or whatever?

THE WITNESS: That is correct.

BY MS. FLOYD [defendant's counsel]: Q: Why did you choose the five day frame?

A. Because of different terrain, different weather conditions, different crew makeup, different crew efficiencies.

I tried to specifically relate the effected area to good production in this specific area.

(emphasis added.)

This excerpt is illustrative of the court's concerns as to the accuracy and reliability of COTR Jones' analysis based on the sampling techniques employed. Although sam-

---

ed that day and is not entitled to recover costs for the entire eight hour period, whereas, ALB

claims time for return travel and reduced production/lost efficiency for the crew members.

pling can be an acceptable technique for evaluating data, generally speaking, a more rigorous methodology is required than the one outlined by COTR Jones. In the first place, five out of approximately 450 days is an extremely small sample. Second, even by his own description, COTR Jones indicated that "hopefully" his assumptions about the number of people on the crew and their degree of efficiency would be the same, and, therefore, subject to projection. Moreover, there is also nowhere in the record a comprehensive explanation of the details of the defendant's sampling technique and how it can be applied by the defendant to challenge plaintiff's claim. In addition, because of his arrogant attitude and his oddly accurate memory on certain minute details, versus his conveniently vague recollections on other key issues, the testimony of COTR Jones,[17] offered in opposition to plaintiff's case, was the least credible of all the witnesses at trial.

### 6. The Effect of Change Order A001 on the Staking Operation

As a result of Change Order A001, Ralph Frame testified that ALB had to return to restake structures between mile 149 and 178 and to revise the staking sheets. The defendant does not dispute this fact, but rather takes issue with the number of hours calculated by Ralph Frame as required for the additional staking work. The court finds that the evidence presented by ALB as to the effect of A001 on the staking operation and the method of calculation utilized in arriving at the additional time required by ALB to restake the structures between mile 149 and mile 178 is credible and persuasive.

Ralph Frame testified that the staking operation had staked all the structures from mile 149, south of Chinook to west of Havre at mile 178, when Change Order A001 was issued. The staking operation had to restake the structures changed by

A001. The restaking operation generated by Change Order A001 required the changing of two types of structures: HSB-type and three-pole-type. The HSB-type structure required the remarking of five stakes at each structure site. On the three-pole structures, anchors as well as structures had to be restaked. The restaking required 3 additional days.

In addition, due to the structure changes associated with Change Order A001, ALB had to identify all the changes in the area, update or revise their staking sheets, and coordinate with the pole hauler in the field. According to Ralph Frame, the planning documents were essential for use in the field because they provided the foundation upon which ALB operated. According to Ralph Frame, ALB needed current working information and did not have the luxury of waiting for WAPA to submit revised plan and profile sheets to them. WAPA finally gave ALB revised plans, however, still in an unusable format because of the poor reproduction quality in late June, more than two months after Change Order A001 was issued. Ralph Frame testified that the necessary revisions required an additional 6 days to complete, although the defendant contends that 6 days is far too long a period of time. The court finds, however, that 6 days is reasonable and supported by the evidence, especially in light of the fact that to perform the same work, WAPA, a much larger operation than plaintiff, required more than 2 months.

### Change Order A001—Damages

 Defendant, WAPA, has conceded, primarily in the contracting officer's final decision, that it is liable for certain limited effects of Change Order A001, a concession which is clearly warranted by the facts and circumstances of this case. However, defendant's concessions do not go nearly far enough. The original specifications concerning the height of the structures were designed by WAPA. Therefore, following

---

**17.** COTR Robert Jones appeared to the court to be overprepared for trial, including his ability to rattle off the relevant weather reports during construction activity by the months. His testimony raised a serious issue for the court of a discrepancy between preparation for trial and revisionist testimony, versus recollection, refreshed, of what actually had occurred at the time of performance of the contract.

award of the contract, ALB began performance of the contract in accordance with the specifications provided by WAPA. It was the failure of structure heights in the specifications to meet the National Electrical Safety Code standards which created the necessity of a change in the height of so many structures. Change Order A001, which included the revised structure heights also was issued under the Changes clause in the contract. Under the Changes clause, plaintiff is entitled to an equitable adjustment for an increase in the cost of performance of the work due to such Change Order.

■ Moreover, regardless of the confusing positions taken by the parties, the court finds that the best way to assess plaintiff's damages is under the Changes clause of the contract. In calculating the damages due to plaintiff, the court finds that, after listening to the testimony of plaintiff's witnesses, including Ralph Frame, David Frame, Warren Sorenson, Barney Olberg, and Steve Stark, and then reviewing the transcripts and exhibits, each of plaintiff's witnesses appeared to be credible and plaintiff's claims for compensation pursuant to Change Order A001 is reasonable. At the same time, the court finds defendant's witness, COTR Robert Jones, far less credible, due to his slick presentation. Moreover, defendant has failed to present adequate testimony or documentation in support of its position on damages or to controvert the plaintiff's trial evidence.

Plaintiff's calculation of the additional work required by reference to time and labor records from the project is far more helpful to this court than the defendant's unsupported assertions, because plaintiff's calculations reflect work actually performed, not hypothetical labor time projections. As the Court of Claims noted in *Lilley–Ames Company*, damage estimates based upon actual costs are preferred over estimates based on hypothetical costs. *See Lilley–Ames Co. v. United States*, 154 Ct. Cl. 544, 549, 293 F.2d 630 (1961).

■ Moreover, when defective specifications, such as the plan and profile drawings given by the defendant to the plaintiff, are inaccurate and delay completion of the contract, the contractor is entitled to recover damages for the defendant's breach of this implied warranty. *See Luria Bros. & Co. v. United States*, 177 Ct.Cl. at 687, 369 F.2d at 708 (citing *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *Laburnum Constr. Corp. v. United States*, 163 Ct.Cl. 339, 325 F.2d 451 (1963)).

Or, otherwise stated:

It is well established that the government warrants the adequacy of its plans and specifications to the extent that compliance with them will result in satisfactory performance. Where a contractor is delayed because the specifications are deficient, it is allowed to recover extra costs resulting from delay due to mistakes in the plans, and its recovery is not limited to an equitable adjustment for the changes ordered to correct those mistakes.

*Chaney & James Constr. Co. v. United States*, 190 Ct.Cl. 699, 705, 421 F.2d 728, 731 (1970) (citations omitted).

A recovery similar to the case at bar was awarded in *Luria Brothers & Co. v. United States*, in which the court stated:

Ordinarily, defendant is entitled to make necessary changes, but where the change is necessitated by defective plans and specifications defendant must pay the entire resulting damage without any deduction for time to make changes, as would be the case if the redesign were necessitated by a changed condition or the like.

177 Ct.Cl. at 690, 369 F.2d at 709; *see also Chaney & James Construction Co. v. United States*, 190 Ct.Cl. 699, 705, 421 F.2d 728, 731 (1970).

Plaintiff, therefore, is entitled to recover damages for the additional work which directly resulted from the structure height changes included in Change Order A001.

**II. Cultural Resource Site Restrictions**

■ Cultural resource site access restrictions during construction are governed by paragraph 1.5.5, "PRESERVATION OF

CULTURAL RESOURCES AND DATA," of the WAPA contract specifications. In pertinent part, paragraph 1.5.5 provides as follows:

a. GENERAL. Federal legislation provides for protection, preservation, and collection of scientific, prehistorical, historical, and archeological data, including bones, relics, and specimens, which might otherwise be lost due to alteration of the terrain as a result of any Federal construction project.

b. KNOWN CULTURAL SITES: Following issuance of notice to proceed, Western will provide the contractor with two sets of Plan and Profile drawings showing all known significant historical or archeological sites located on or immediately adjacent to the transmission line right-of-way. These sites shall be considered avoidance areas. Prior to any construction activity, the contractor shall mark the avoidance areas on the ground to the satisfaction of the Authorized Representative. There are approximately 20 sites involved. The contractor shall instruct his employees, subcontractors, or other representatives that vehicular or equipment access to these areas is prohibited. If access is absolutely necessary, the contractor shall first obtain approval from the Authorized Representative. The ground markings shall be maintained throughout the duration of the contract. Western will remove the markings at its discretion during or following final cleanup.

c. UNKNOWN CULTURAL SITES:

(1) Reporting: If the contractors or any of his employees in the performance of work under these specifications discovers evidence of possible scientific, prehistorical, historical, or archeological data, the Authorized Representative shall be notified immediately and given the location and nature of the findings. The contractor shall forward written confirmation within two days. The contractor shall stop all activities within a 50-foot radius of the discovery site and shall not proceed with work activities at the site until permitted to proceed by the Authorized Representative.

(2) Care of Evidence: The contractor shall exercise care so as not to damage artifacts or fossils uncovered during his construction operations and shall provide such cooperation and assistance as may be necessary to preserve the findings for removal or disposition by Western.

d. CONTRACT ADJUSTMENTS: Where appropriate by reason of a discovery, the Contracting Officer may order delays in the time of performance, or changes in the work, or both. If such delays, or changes, or both, are ordered, the time of performance and contract price shall be adjusted in accordance with the applicable causes in the General Provisions.

e. SUBCONTRACTS: The contractor shall insert this paragraph in all subcontracts which involve the performance of work on the terrain of the site.

Based on the contract specifications, WAPA was to provide the contractor, ALB, with two sets of plan and profile drawings showing all known, significant, archeological sites located on, or adjacent to, the transmission line right-of-way. The sites deemed cultural resource sites were considered avoidance areas, on which vehicular or equipment travel was to be denied. If access was absolutely necessary, however, the contractor was to obtain access approval from WAPA's authorized representative. Moreover, the bid documents stated that there were approximately 20 cultural resource sites involved in the project. During the course of the project, however, WAPA identified a total of 31 cultural resource sites along the project transmission line. In its "Statement of Admission of Liability," filed on May 9, 1989, the defendant admits liability in the amount of $8,637.09 for the additional work required of the plaintiff as a result of cultural resource site restrictions. The plaintiff, however, in its "Claims Summary" filed on May 16, 1989, argues that the WAPA is liable for an additional $68,403.00, as a result of the cultural site restrictions imposed on its

operations.[18]

In its complaint, the plaintiff identifies a number of theories of liability in support of its claim for additional compensation for costs incurred as a result of the cultural resource site restrictions. The plaintiff initially points to the contract bid specifications which state that approximately 20 cultural resource sites would be located along the project. After contract bid was accepted, however, WAPA identified a total of 31 sites. ALB argues that this increase in identified sites resulted from WAPA's use of inadequate procedures to identify and classify resource sites, which, in turn, led to increased costs. Furthermore, the plaintiff asserts that WAPA did not advise the Montana Historical Society of proposed access routes. Nor did WAPA examine those proposed routes for cultural resources, or prepare a mitigation plan in a timely manner. As a result of this alleged delay, the plaintiff argues a number of parcels and access roads which originally had been or were to have been made available to ALB for construction, were closed to construction equipment, and impacted ALB's ability to perform the work under the contract. Although no separate, formal Change Orders were issued regarding access to the cultural resource sites modifying the contract, there is no dispute between the parties that the timing of the releases of the cultural resource site restrictions impacted the contract performance. Moreover, it is clear that ALB did not volunteer to alter the original construction schedule, or to perform what plaintiff has alleged was extra work under the contract terms.

During the course of performance, the government identified to the contractor the 31 cultural resource site restrictions in letters it delivered to the ALB. Several of the structures on which ALB was to work were actually located within the boundaries of the identified cultural resource sites at miles 13/14; 28; 31/32; 50; 69/70; 144; 170 and 175. By letter, WAPA issued numerous travel restrictions to ALB with directions such as "stay off until further notice" and "no travel allowed on site." On February 21, 1984, WAPA transmitted a letter to ALB which identified 16 cultural sites with restrictions, including instructions to "stay north of fence" at sites 24HL196 and "stay off until further notice" at sites 24HL192 and 24BL575. On April 13, 1984, WAPA transmitted another letter to ALB reconfirming that the previous restrictions were still in force. In this letter, WAPA stated that it hoped to have a cultural resource mitigation plan approved by May 1, 1984, and that at that time, WAPA would provide detailed instructions for each site.

On May 6, 1984, ALB wrote WAPA a letter stating that some transmission line structure sites were inside areas on which WAPA had prohibited access in its April 13, 1984 letter. In the May 6, 1984 letter, ALB objected that this information had not been available to it at the time the project was bid. ALB requested approval to enter structure sites as they fell into its sequence of operations. In addition, ALB advised WAPA that if these sites had to be bypassed and constructed at a later date, there would be additional costs and construction time required to complete the project.

In response, on May 11, 1984, WAPA transmitted a letter to ALB stating that the cultural resource site restrictions were still in effect and ALB's request to enter those sites was denied. WAPA, however, wrote: "Hopefully, we will be able to lift those restrictions in the next two weeks." Notwithstanding WAPA's optimistic representation, the restrictions were not lifted quickly. During the course of that year, WAPA transmitted various letters relaxing some restrictions, lifting others, and imposing strict restrictions on still other cultural sites. For instance, on June 22, 1984, WAPA transmitted a letter to ALB identifying 15 cultural sites to which restrictions

18. The court notes that neither the defendant's "Statement of Admission of Liability" nor the plaintiff's subsequent submission, the "Claim Summary," indicate whether the $68,403.00 figure includes the $8,637.09 to which the government has admitted liability, or, whether the $68,403.00 is in addition to the government's admitted liability.

applied. Six of these cultural sites continued to have "no travel allowed on site" restrictions, which ultimately impaired ALB's operation.

Even though defendant had indicated in April 1984 that it hoped to have its mitigation plan approved by May 1, 1984, as late as October 9 and 12, 1984, WAPA was still transmitting letters to ALB restricting construction activities at certain sites until WAPA's mitigation plan had been completed. It was November 2, 1984, before WAPA transmitted a letter to ALB lifting restrictions to the last cultural resource sites which directly affected ALB's operations.

It appears, therefore, that WAPA's actions regarding the cultural resource sites resulted in a constructive change to the contract for which ALB is entitled to compensation. The issue remains, however, to what extent the alterations made by ALB to its construction plans, were necessitated by the later than projected release dates of areas impacted by the identified cultural resource sites. In general, a contractor should be entitled to recover for those costs which are identifiable as additional to the work contracted for between the parties. This should include items, including but not limited to, extra travel time due to necessary skipping, changed installation procedures caused by the inability to follow the original construction plan and/or the need to move crews on and off parts of the project in response to the need to double back to skipped sites.

The plaintiff has filed claims regarding the impact of cultural resource site restrictions on construction activities at miles: 13/14; 28; 31/32; 50; 69/70; 144; 170; and 175. The court, after having reviewed the trial transcript, as well as the documentary evidence presented at the trial, finds Ralph Frame's almost completely unrebutted testimony on the impact and cost calculations regarding plaintiff's cultural site restriction claims, to be credible and reliable. The court rejects the defendant's argument, which apparently seeks to deny all of the plaintiff's compensation claims which are not reflected in ALB's time cards. The court is unpersuaded by defendant's version, especially in light of the fact that the defendant's counsel recognizes in its post-trial brief that "in the absence of actual data, adequately supported estimates may be relied upon to prove damages."

In arriving at the time and cost involved for each operation, Ralph Frame deducted from the time cards the time it would have taken the crews to do the work had they been able to perform the required work on the initial run. He used this approach because the time it took a crew to bypass the site on the initial pass was not accounted for on the time card, since the employee would not have recognized it as an extra cost, and, therefore, did not keep track of such time. In addition, when Ralph Frame was unable to calculate the hours from the time cards, he went to the field and talked to the people who actually performed the work. In his calculations, Ralph Frame also relied on several additional factors, such as difficulty of terrain, weather conditions, whether or not there was a gate in the fence that needed opening, or if the crew had to go around the fence to a gate. Ralph Frame's testimony was buttressed by that of Warren Sorenson, ALB's project supervisor. Sorenson testified that the impact of the cultural site restrictions was greater than just having to skip around the area; for example, the crews had to incur extra driving time by going around the cultural site initially and then returning, sometimes with a different crew, to pick up the skips and to move equipment to accommodate the unanticipated schedule.

### 1. The Effect of Cultural Site Restriction at Mile 13/14

The pole hauler, Steve Stark, testified regarding the impact of the cultural site restrictions had on his delivery route. He stated that if a structure was located on a restricted cultural site, or off a restricted right-of-way, he could not deliver the poles to the structure site itself, but, rather, would have to drive up to the closest possible edge of the cultural site and deliver the poles to that point. He would then have to

retreat back down the right-of-way to the access road, back out to the public road, then take another access road and come back in to the other side of the restricted cultural site to deliver poles. In other words, the cultural resource site restrictions placed on the contractor, prevented Stark from proceeding in a linear manner down the right-of-way. Because the pole hauler reached the cultural site prior to WAPA's release of the site at mile 13/14 on November 2, 1984, he was forced to leave the poles just outside the boundary of the cultural site, which required ALB to return to the site and move the poles to the structure. Ralph Frame testified that the unanticipated work required an additional 2 hours.

The ground wire crew was also impacted by the cultural site restrictions. The ground wire operation involves grounding two structures together underground. By the time the cultural resource site at mile 13/14 was released by the defendant, allowing ALB to work on the site, the groundwire crew already had passed through the site and was working in the Fort Peck area. As a result, the ground wire crew was required to return to the site late in the year when travel conditions were poor. The crew then had to travel back through Glasgow, west toward the Richardson Coulee station, follow county roads to structure 19, and then take an access road to the cultural site to perform their work. Ralph Frame testified that based, among other sources, on the time cards the ground crew operation incurred 6 hours of additional work. Likewise, the cross-arm and insulator crew had to pass over the area when they initially came through. Ralph Frame testified that the cross-arm insulator crew incurred 6 extra hours of work due to the fact that they had to return to the site twice, once to put the cross-arms on, and a second time to put the insulators on, after the structure had been framed.

When the staking crew initially passed through the cultural site at mile 13/14, they bypassed the site because there was a "no travel" restriction. At the time, the site was cleared for access, the staking crew was working out of Malta, at mile 65. Consequently, the crew had to come down on a wet, snowy day, traveling from Malta along Highway 2 to Glasgow, on county roads south and west to structure 21, and then down to the site to do the staking work. By the time the crew traveled to the site, did their staking work and returned to the work site, they had worked an extra 8 hours and 30 minutes.

### 2. Effect of Cultural Site Restriction at Mile 28

The area around mile 28 is located at the Richardson Coulee sub area, just west of Glasgow. By the time WAPA allowed work to be performed on structures at this site, November 4, 1984, the pole haul, ground wire, and staking operations had bypassed the site during its initial operation and had to return to complete their work.

The pole hauler was unable to deliver the poles to the location at mile 28 because of the restrictions in place when he initially reached the site. Consequently, Steve Stark left the poles outside the site and continued down the line. ALB then had to return to the site with their equipment to move the poles to the site. By this time, the equipment had reached Fort Peck and the men and the equipment had to travel back along county roads, toward Glasgow, then travel from mile 12 or 13 to mile 28 to complete the work. The testimony in the record documents that the delayed release of this cultural resource site restrictions by the defendant generated an additional 3 hours.

The ground wire crew also had to return to do work at these structures. The crew first finished the extra work at the structures in mile 13 and 14, then traveled over to do the work at the structure in mile 28. The court is persuaded by Ralph Frame's testimony that the procedures chosen by ground framing crews were the most efficient, and that because of the delayed release of the site, the weather conditions, including wind, and the need to relocate the equipment, back and forth, that there resulted an additional 6.5 hours of work.

The final operation to be affected by the cultural resource site restriction at structure 28 was the ground staking crew. Ralph Frame testified that the crew had to return from Malta and stake 2 structures with a number of anchors, which required about 4 extra hours. Based on the testimony presented, the court is persuaded that ALB should be entitled to extra costs to travel to and from the site. ALB, however, should not recover for the time to perform the actual staking operations, unless duplicative, since those costs would appear to be covered under the terms of the original contract.

3. *Effect of Cultural Resource Restriction at Mile 31/32*

The cultural site in miles 31 to 32 involved 9 structures which were all located inside the cultural site.[19] Each of the separate operations involved in completing the contract requirements was impacted by defendant's delayed release of the cultural resource restriction. On October 9, 1984, WAPA furnished requirements which permitted travel around this cultural site, but did not permit any work to be performed at the structure sites themselves. Access road 1725 was never released to ALB, but the October 9, 1984 release did permit a shorter travel way to the next structure. On November 2, 1984, WAPA allowed work to be performed at the structure sites. The crews, therefore, returned to do the work in November, when working conditions were not good due to poor road conditions and snow.

The pole haul crew had been proceeding east from mile 41 down to mile 32, traveling along the center line. When the pole hauler reached mile 32, the site had not been cleared for access. In order to reach structure 32/6, or to perform work in mile 31, the pole hauler needed to travel along the center line for 9 to 10 miles, going west. Because of the cultural resource site restriction, Steve Stark simply unloaded his poles on the outside of the cultural site in a stock pile close by. He left poles for 7 structures on the west side of Antelope Creek which bisected the cultural site. On the east side, he left poles for 2 structures, to be used on the east side of the creek. Deducting the time Steve Stark would have needed to do the job had he been able to proceed as initially planned, it appears that the pole hauler incurred 10 extra work hours for the poles on the west side of the site, since he had to come back and redistribute the poles after the site had been cleared for access. ALB brought their equipment and placed the 2 structures on the east side of the creek because Steve Stark could not cross the creek due to snow.

When the roads and landing operations came through the site, the restrictions had been partially released. WAPA permitted travel through the cultural site as long as the crew stayed on the road, but the partial release did not lift the no work restriction. According to Ralph Frame, the road and landing crew incurred an extra 1 hour of time to bypass the site and continue on.

When the ground framing crew passed through the site at mile 31/32, they were permitted to travel through on an access road and continue on, but they could not perform the work at the site. Evidence at trial indicates that after the ground framing operation reached Fort Peck, they turned their operations around, including cranes, a pick-up, and the crew, from Fort Peck, and headed westerly on Highway 2 to Glasgow, then along county roads to Richardson Coulee at mile 28, and, then, following the center line, went back to the cultural site at mile 31/32. This travel required an additional 1.8 days. When calculating the extra days for the ground framing crews, Ralph Frame used the time cards and deducted from the hours the average production rates they had achieved on either side of that site on the initial pass-through.

The ground wire crew was at the Richardson Coulee station when they were required to return to perform the work at mile 31/32. This required the crew to trav-

---

**19.** Access road 1725 was also involved at mile 31/32, but the costs incurred as a result of its unavailability are addressed below in the section on ALB's right-of-way claims.

el from mile 28, along the centerline into the cultural site, plow the ground, wire and bring their equipment back out. The testimony of Ralph Frame does not make reference to the amount of travel time the ground wire crew required to return to mile 31/32. ALB's time cards, however, indicate that the crew spent 4 hours traveling to and from the site to install the ground wire on November 14, 1984. Moreover, the defendant agrees in its response to plaintiff's post trial memorandum that ALB's ground wire crew spent 4 hours traveling to and from the site in question.

The cross-arm and insulator crew had to return twice from Malta, some 65–70 miles away, to complete their work, once to do the cross-arm activity and the second time to do the insulator work. In order to travel to the site from Malta and then back, twice, required 2 days and 1 hour as testified to by Ralph Frame, and supported by the time cards.

Regarding the impact of the late releases on the staking operation, WAPA agreed that ALB is entitled to an extra recovery for costs consisting of 5.39 hours.[20] In "Defendant's Post Trial Response to Plaintiff's Post Trial Memorandum," the government appears to concede, as did the contracting officer in his 83-page analysis, that ALB expended 5.39 additional hours for added travel for the staking operation.

The digging operation had to return from mile 4/1 to mile 31–32. This required travel through Glasgow, about 15 miles, west along county roads to structure 28, and then along the centerline to mile 31 to dig the holes. Because the weather was chilly, the digging operation had to stay close to the setting operation so that the earth would not become frozen and jeopardize the backfill, the material put back in the hole after the pole was set. When the digging and setting crews finally went back into this area, there were about 18 inches of snow along the centerline. The time cards for 11/12/1984, 1/16/1985, and 1/17/1985, indicate that the digging crew spent .5 hours, 4.5 hours, and 4 hours performing additional work on the aforementioned dates, respectively. Therefore, the digging crew incurred an additional 9 hours of work. After these crews completed the work, they returned east to mile 28 at Richardson Coulee then back through Glasgow to Malta. Ralph Frame's testimony proves that the digging operation required 1.38 additional days, which is consistent with what is shown on the time cards.

### 4. *Effect of Cultural Resource Site Restriction at Mile 50*

The court finds that construction on structure 50/5 was affected by the cultural site restrictions at mile 50, south of Saco. WAPA on October 9, 1984, released the site, but forbade work to be performed at the structure. Although there are no time cards to demonstrate the amount of time incurred by the gate crew as a result of the site restriction at structure 50/5, the trial testimony offered by the plaintiff, which suggests that this crew incurred 1.19 days to return and perform work at the structure, is uncontested in the record or in defendant's post trial filings. The evidence presented at trial indicates that the 1.19 days was for returning to the structure, digging the holes and installing the gate.

---

**20.** The contracting officer's analysis includes the following calculation:

SITE 24VL1113—

<u>Staking (Str. 31/6 thru 32/6)</u>
| | |
|---|---|
| Travel from Malta to Tampico turn-off | |
| 53 Hwy. miles at 50 mph. | 1.06 hrs. |
| Travel from Tampico turn-off to Mile 28 | |
| 7 Co. Road miles at 45 mph. | 0.16 hrs. |
| Travel from Mile 28 to 31/6 | |
| 3.5 ROW miles at 3 mph. | 1.17 hrs. |
| Travel from 32/6 to 25/1 | |
| 9 ROW miles at 3 mph | <u>3.00 hrs.</u> |
| | 5.39 hrs. |

However, it is difficult for the court to make a determination from the facts presented as to what amount of this additional claim for the 1.19 days of work is for work required under the contract, or for work which is extra as a result of the cultural site restriction. Therefore, the court is inclined to disallow this portion of the plaintiff's claim.

The evidence presented at trial, however, amply supports the fact that the roads and landings crew, the setting crew, and the ground framing, cross-arm and insulator, and staking operation were impacted by the restriction and structure 50/5. The roads and landings crew could not go through the site and, as a result of having to bypass the site, lost 2 hours of operation time. Similarly, the fence grounding operation was delayed 1 hour because the fence grounds could not be installed, since the three-pole structure was physically located within the cultural site boundaries. The fence ground work was ultimately performed by the setting crew, which incurred an extra .44 of a day of extra work to hand-dig the ground wire. The ground framing crews were double shifted at the time the operation passed mile 50, requiring both to go through the site, and causing these crews a 4 hour delay. The cross-arm and insulator crew experienced a 2 hour delay in order to bypass the site. Finally, the staking operations incurred an additional 6 hours of work at this site, since the three-structure pole required staking anchors. The crew had to come from Malta, by traveling east to Saco on Highway 2, a distance of 20 to 25 miles, then south of Saco, another 15 miles to the line, then follow the access road in to stake the structure, and then return the same way back to Malta.[21]

### 5. *Effect of Cultural Resource Site Restriction at Mile 69/70*

On June 22, 1984, by letter, WAPA furnished instructions to ALB which did not permit any travel, and, consequently, allowed no work to be performed at the cultural site at mile 69/70. On June 26, 1984, WAPA, again by letter, released mile 69/8 to 70/2 for work; however, WAPA did not release the site for tracked vehicles or bladework, and all traffic was confined to a single lane. Finally, on October 9, 1984, WAPA fully released the site.

Evidence presented at trial indicates that on August 11, 1984, the roads and landings operation had been proceeding east from Malta and had reached the cultural site in question; however, the crew could not proceed through the site because the restrictions did not permit track vehicle travel or excavation for landing work. The cultural resource site at mile 69/70 was rather large, and there were a number of structures to be worked on within this cultural site, 3 of which required landings to be built. The landing and road equipment consisted of a bulldozer, which on the initial pass-through had to be "walked back" west approximately two and one-half miles and loaded onto a truck transport. From there, it was hauled around the cultural site, about 26 or 27 miles, after which it was hauled south of the site along the county road back to the Malta area, out along county roads to the right-of-way at mile 68, and by transportation west, along the right-of-way to the beginning of the cultural site, so the crew could continue its work in an easterly direction. After the roads and landing crew completed its work in Fort Peck, and the site was fully released, the equipment was returned to Malta to be loaded and hauled for a distance of 15 miles back to the site to do the landing work. As testified to by Ralph Frame, the extra time required by the road and landing crew was 2.75 days.

The staking crew staked the structure site during its initial pass-through in June,

---

21. The plaintiff has requested .19 hours for the digging crew, however, at trial Ralph Frame indicated he was unable to define clearly what work this crew performed. Therefore, the court will not award any time for the digging operation in the mile 50 area.

Similarly, the plaintiffs are claiming .38 hours for additional work performed by the ground wire crew on "10/6/84" and "10/84." After a review of the time cards the court is unable to identify the ground framing hours claimed by the plaintiff. Therefore, the court is also not willing to make an award for the ground wire crew at the mile 50 area.

1984, however, since the stakes had been there for almost three months prior to the time the digging and setting operations came back to perform the work, the setting crew had to return to the site to freshen up the stakes. The staking crew incurred 2 extra hours of work time to do this work. The digging and setting operations were in Malta when they returned to set the structures. According to the testimony of Ralph Frame, the digging crew required .42 day to drive from Malta, perform the work and return to Malta. The setting required .53 day to perform its work and drive to and from Malta.

### 6. Effect of Cultural Resource Site Restriction at Mile 144

On February 21, 1984, WAPA furnished instructions that did not permit any travel on the site, and, consequently, prevented ALB from performing necessary contract work upon their initial pass. On May 16, 1984, WAPA released the structure site, permitting work to proceed. Ralph Frame testified that since the site was not released before the crews reached the site, he had to "go out and look the site over, and flag a route around it so that the crews could then bypass the site and continue on." Later that day, based on representations made by WAPA's Danny Paul to Ralph Frame that the site had been released, Ralph Frame returned to the site to remove the flags so that work at the site could be allowed. However, by the time Ralph Frame reached the site, the ground wire operation had already passed through. The testimony reflects that this staking operation required .38 of a day.

In addition, since the ground wire crew had already passed through the site, ALB had the setting crew dig the ground wire by hand, rather than have the ground wire crew return to perform the work. Testimony presented at trial, based upon time cards, revealed that the wire crew incurred an additional 30 minutes performing the ground wire crew's work, due to the late release of the site.

### 7. Effect of Cultural Resource Site Restriction at Mile 170

On February 21, 1984, WAPA furnished instructions prohibiting travel on the cultural site in mile 170, site number 24HL192. Even though there was a restriction on the site, ALB's pole operations, roads and landings crew, and fence grounds crew, with the permission of WAPA's Danny Paul, were permitted to pass through the site. On May 23, 1984, the state of Montana Department of Natural Resources and Conservation, Energy Division sent a letter to WAPA informing them of ALB's use of the site in question. Shortly thereafter WAPA imposed restrictions on ALB, and subsequent operations were not allowed to travel the road. The site was ultimately released on June 1, 1984.

Evidence presented at trial indicated that the crews had to skip the site in question, move on to the next structure and then back-track. This required that the crews load their equipment and back-track, north, along an access road to the country road, about two miles, then follow the county road in a northeasterly direction toward Havre to another country road, and then go south, until the road intersected the right-of-way again. This route took a substantial amount of time and some of the crews, such as the staking operation, had to make several trips. Plaintiff's evidence supports the claim of .44 of a day of additional work for the ground framing crew; .44 of a day for the ground wire crew; .31 of a day for the cross-arm and insulator crew; .38 of a day for the gate crew; .75 of a day for the digging crew; and .63 of a day for the setting crew.

### 8. Effect of Cultural Resource Site Restrictions at Mile 175

There were several cultural site restrictions imposed at mile 175 (24HL195 and 24HL196). The first restriction was announced by defendant on February 21, 1984, when WAPA sent a letter to ALB informing them to "stay off" the site in question until further notice. On April 13, 1984, WAPA sent another letter to ALB

informing them that "[t]he instructions listed in my letter of February 21 are still in force." On May 11, 1984, WAPA notified ALB by letter that, "the restrictions for the cultural resource sites along the transmission line are still in effect." WAPA finally allowed work at the sites on May 16, 1984. In this area there were 3 structures, with structure 175/7 being the principle structure affected. The late release of the site had a distinct impact on ALB's work crews because by the time the site was released most of ALB's operations had already gone through and by passed the site.

The impact of the late release of the cultural site at mile 175 was similar to that of building a wall in front of the crews, thereby forcing each crew to find some other way to reach the next structure site. Due to the travel restriction, these operations had to come back to a county road from the site, north about half a mile, then take another county road westerly, then use a field access road to return to the right-of-way, approximately 2 miles west of where they wanted to perform the work. The operation then had to travel back along the right-of-way to the structure on the other side of the cultural site to begin activities again. There, however, was no effect on the clearing operation as a result of the restriction. The evidence presented at trial demonstrates that ALB incurred 3.94 extra days work in this area.

III. Right-of-Way Restrictions

Paragraph 1.3.1 of the contract specifications provides for Rights-of-Way. Paragraph 1.3.1 of the contract specifications provides as follows:

> Western [WAPA] will provide the right-of-way for the transmission line and right-of-way for access thereto over routes established by Western. The contractor is cautioned that various wooden bridges across irrigation canals may not support heavy construction vehicles and/or loads. The contractor should visit the area prior to bidding to determine allowable loads.

> The transmission line right-of-way is 150 feet wide, except at locations where guys and anchors required additional right-of-way. Western has acquired access easements from existing public roads to the transmission line and a considerable amount of off right-of-way access along the transmission line. Western does not represent that the contractor can gain access to every structure site or travel continuously along the transmission line. The contractor shall either orient his construction methods and equipment to utilize Western-furnished rights-of-way or obtain additional temporary access at his own expense. Any additional temporary access acquired by the contractor must have prior approval by Western since several areas of the transmission line do have travel restricted areas. During the period of the contract, Western reserves the right to use any contractor-obtained access.

> The contractor must contact the manager of the Ft. Assinnibone and Agricultural Research Center prior to any entry on the Center's lands.

In its "Statement of Admission of Liability," filed on May 9, 1989, the defendant admits liability in the amount of $6,088.77 for the additional work required of the plaintiff as a result of delays in releasing certain parcel right-of-ways. In the plaintiff's "Claim Summary," filed on May 16, 1989, plaintiff asserts that WAPA is liable for an additional $60,955.00 as a result of the rescission of the right-of-way for access road 1725, and the untimely release of rights-of-way in the mile 124 to mile 126 area and in the mile 113 to 114 area.[22]

At the time of bid, WAPA represented that it would provide the rights-of-way for the transmission line and made available a plan and profile, showing where the transmission line was supposed to run and identifying the available access roads. During the course of the project, WAPA failed to

---

**22.** Again, the court notes that neither the defendant's "Statement of Admission of Liability" nor the plaintiff's "Claims Summary" indicate whether the $60,955.00 figure includes the $6,088.77 for which the government has admitted liability, or, whether the $60,955.00 is in addition to the government's admitted liability.

obtain, or obtained later than projected, various access routes which had been identified in the plan and profile. Moreover, in several instances, WAPA rescinded various access routes, which had been previously identified as available.

### 1. *Access Road 1725*

■ When David Frame prepared ALB's bid, he had been supplied a copy of WAPA's plan and profile drawings which depicted the access routes [23] marked with a dash line and number. Access road 1725 was shown on the plan and profile with a dash line and was identified with its number as an existing road. WAPA's COTR, Robert Jones, admitted at trial that WAPA furnished the ownership map for the area and the plan and profile, to bidders prior to bidding and that this map shows access road 1725 as an acquired off right-of-way access. David Frame testified that ALB relied on the information that access road 1725 was one of WAPA's already acquired roads when preparing its bid. On May 24, 1984, WAPA released access road 1725 to ALB for travel and construction activities. Thereafter, on October 3, 1984, WAPA rescinded the access and indicated to ALB that it was not to utilize this access road during the project. ALB advised WAPA of its need for access road 1725 and notified WAPA that there would be additional costs and time resulting from the deletion of that access route.

According to David Frame, ALB crews were affected by this change on a daily basis and the lack of access road 1725 was significant because it was one of the few existing roads in the area which would allow ALB to get to the transmission line right-of-way. Also, according to Warren Sorenson, the lack of access road 1725, along with the cultural resource site restrictions, located around mile 32/33, caused problems for the crews because of the added travel distances involved.

Steve Stark also described the unavailability of access road 1725 as creating a serious problem for him during the pole hauling operation. Stark had to come in from Hinsdale, by way of a county road, then take an access road on to the transmission line right-of-way for approximately eight or nine miles. From that point, down to the cultural site, Stark was forced to work in and back out of that nine mile right-of-way, traveling over the same ground time and again. To travel around the cultural site without access road 1725 was about 100 miles. Ralph Frame testified at length, and the court found his testimony that the pole haul operation incurred 3 crew days of additional work as a result of the unavailability of access road 1725 to be reasonable and persuasive.

The roads and landings operations were caused .38 of an additional day, due to a slow down when making their initial pass through the area. The roads and landings crews parked their equipment at the site and waited until WAPA issued a partial release allowing them to go through. Similarly, the fence ground crew had a slow down of .19 of a day. The two ground framing crews working in miles 42 to 28 incurred 1½ days of extra time due to the unavailability of access road 1725. As they worked from mile 41 back to mile 31, they had to go a much greater distance from the show-up area, where the operation started each morning, to the work site. According to Ralph Frame, the ground wire operation was slowed down by .38 of a day extra time for the same reason as the other crews, but because it was a slow-down rate, it did not show up on the time cards. The same type of slow-down effect was felt by the cross-arm and insulator crew while it was working in the area. The ground frame and insulator crew performed two separate operations on the WAPA project. First, the crew attached the cross-arms to the structure; the crew later return to install the insulators. Again, according to Ralph Frame, this crew incurred a total of a half day of extra time.

The same basic slow-down effect also impacted the work of the staking operation, except that it was amplified because the staking operation had to pass through the area on more occasions. Moreover, many

---

**23.** Access routes are denoted as "AR" on various filings submitted to the court by both parties.

additional reconnaissance trips were necessitated due to the unavailability of access road 1725. The staking crew also had to return to stake the 9 structures until release of the related cultural resource site. As a result, the staking operation was required 3.1 extra days. Between mile 42 and mile 28, the work of the gate building crew was subject to the same slow-down effect. The gate building crew incurred 6 hours of extra time, since they could not use access road 1725, or travel through the cultural site at the time they initially came through the construction area. Both the digging and setting crews were impacted similarly to the ground framing crew, and also incurred ¾ of a day extra time, as a result of the unavailability of access road 1725.

Based on the evidence presented at trial, including the largely unrefuted testimony of Ralph Frame, the court finds that a constructive change to the contract occurred with respect to access road 1725. ALB did not volunteer to perform the additional work associated with WAPA's recission of access road 1725. According to Ralph Frame, ALB's crews endured significant hardships by having to take the approximately 100 mile detour around the site, as a result of denial of access through route 1725, compounded by the denial of travel through the cultural sites at miles 31/32. WAPA's interference with ALB's orderly progress down the transmission line created a significant cost impact on ALB's performance of the contract.

In response to plaintiff's claims regarding the cultural resource site restrictions, the government relies on language in the contract that "Western [WAPA] does not represent that the contractor can gain access to every structure site or travel continuously along the transmission line." In "Defendant's Response to Plaintiff's Post Trial Memorandum," defendant submits that "[t]he specifications clearly state that the contractor is not justified in relying upon the drawings." The court, however, notes that the language of the contract is not nearly as unambiguous as the defendant suggests. If 4.1 ¶ 4.1.1a of the specifications is the section upon which the de-

fendant intends to rely, it certainly does not state that a "contractor is not justified in relying upon the drawings."

Section 4.1.1 of the contract reads:
DRAWINGS, GENERAL:
a. GENERAL: Some of the drawings included herein show details of fabrication, and other details and specifications not a part of work required under these specification. Specifications and details shown on those drawings which are not applicable under these specifications shall be disregarded. Reference drawings referred to on specifications drawings, and not included herein, are not considered necessary for bidding purposes but will be furnished to the contractor, where necessary, for construction purposes. Where details shown on Standard Drawings contained in these specifications differ from those shown on other drawings or the requirements of these specifications differ from those shown on other drawings or the requirements of these specifications, the details shown on other drawings or the requirements of the specifications shall govern. In the event there are minor differences as determined by Western between details and dimensions shown on the drawings and those of existing features at the site, the details and dimensions of existing features at the site shall govern. The parts of the work for which dimensions are not shown have been drawn to scale as nearly to final dimensions as possible prior to the purchase of machinery or equipment and prior to the development of final general and detailed designs.

The contractor shall check all drawings carefully and advise Western of any errors or omissions discovered.

The court finds the arguments advanced by the government that a reasonable contractor would not have relied upon the drawings to be incorrect. The drawings were provided to prospective contractors for the purposes of formulating a bid for the project. Moreover, the defendant actually granted the access to a road, before later rescinding such access. The court is per-

suaded that it was reasonable for the contractor to rely on the availability of access of access road 1725, when it prepared its bid under the contract.

### 2. *Right-of-way in the Mile 124 to 126 Area*

Paragraph 1.1.3.a of the specifications provides for the notice to proceed, including mile 124 through 127 (structure 124/6 to structure 127/1), by May 1, 1984. WAPA did not secure a right-of-way release to parcel 334, in miles 124 through 126, until July 24, 1984. By letter, dated July 24, 1984, WAPA released parcel 334 for construction activities. There were 17 structures involved on parcel 334. By the time the site had been released, all front end activities, including the setting operations, had reached and skipped the area of parcel 334, and they had to return to perform the necessary work.

Based upon the evidence presented during the trial, it is clear that a constructive change occurred as a result of WAPA's late release of right-of-way to parcel 334 in miles 124 through 126, forcing certain crews to skip the parcel in their initial pass through, and requiring them to return to perform the work under the contract.

The court is persuaded by Ralph Frame's unrebutted testimony concerning the additional time and labor incurred as a result of WAPA's late release of the right-of-way at issue. According to Ralph Frame, the additional time required to complete the work for all of these operations was calculated from the time cards and from the summaries on the progress chart. Moreover, after the total time had been calculated, Ralph Frame calculated the difference between the actual production rate, and the production rate had there been no skip, in order to determine the extra work time. He also took into consideration the difficulty of each site. For example, the western part of the site was agricultural land which contained very wet soil which impacted the digging and setting operations.

In addition to the right-of-way delay, there was also a line change in that area. Therefore, just prior to the time all the activities returned to do the work, the staking operation had to return in the snow to check that the stakes were still in place and marked properly. As a result, the staking operation incurred an extra 2½ days of work.

The clearing operation passed through parcel 334 early in the project. At the time of the release of 334, the crew was working out of Chinook and had arrived at Malta and needed to top and cut some trees. They began working at Malta, but the property owner stopped the work because he had not been paid by WAPA. WAPA's Danny Paul went down to straighten out the situation. As a result of this work stoppage, the clearing crew lost ½ day of time.

The gate operation for parcel 334 was affected an extra ½ day by the late release. When the gate operation had initially passed through, the property owner had given permission to put the gate in, even though he had not settled with WAPA and the parcel had not been released. At structure 125/8, Danny Paul asked ALB not to install the gates because, even though the property owner had given permission to do the work, WAPA did not want the gates installed until the parcel had been settled. The gate crew, therefore, had to come back from Malta to put these gates in, as a consequence of which the gate crew incurred an extra ½ day of work.

The digging and setting operations were brought back from Malta in January 1985 to complete their work at parcel 334, the digging crew incurred 4 extra days to complete their work and the setting crew incurred 3½ days of work.

At the time the pole hauler came back to deliver poles in the mile 124 to 126 area, he had been working near Fort Peck. The pole hauler traveled back 125 to 130 miles along the centerline, then along the road through Malta. He had some poles in a yard at Savoy, some in a yard at Malta, and also some in a yard between Harlem and Savoy. Steve Stark, the pole hauler, came back and picked his poles up from Malta and delivered those in 1 day. He picked up the other poles and delivered them in an-

other day. The pole hauler incurred 2 extra days to deliver the poles to the site. Because of the weather conditions in November 1984, after the late release, the pole hauler could not deliver all the poles specifically to the site. Instead, he left the poles for 7 or 8 structures in piles near the site. ALB eventually came back and delivered those poles to the structure sites with a forklift. It took ALB 1 extra day to spread the poles. Therefore, according to Ralph Frame, to complete the additional pole haul operation in the 124–126 area required an additional 3 days.

Because of the late release of the right-of-way restriction at parcel 334, the roads and landings operation had to be brought back from the Malta area near mile 80 to the mile 124 to 126 area to perform the work, and load and haul the equipment to Chinook, rather than return to Malta, which, according to Ralph Frame, required an extra 1½ days of work. The fence ground operation also was working out of Malta and needed an extra ¾ of a day to do its work. Likewise, the ground framing operation incurred an extra 4½ days to do its work, including time for the initial pass-through for the 2 ground framing crews and the time taken by the first crew to return from Malta to do its work. Again, according to Ralph Frame, the ground wire crew also incurred 1 extra day to come back and perform its work, and the cross-arm and insulator crew, likewise, incurred an extra 3⅓ days to perform its work.

3. *Right-of-Way in the Mile 113/114 Area*

■ Structures 113/7 and 114/4 through 114/8 are located on parcels 316 and 318 and accessed by access road 5983. On April 27, 1984, WAPA released parcels 316 and 318 for construction activity. WAPA experienced difficulty in securing the right-of-way release on the parcel covering miles 113 to 114. In a letter dated June 29, 1984, WAPA withdrew permission for ALB to enter parcels 316 and 318. In a letter dated July 2, 1984, WAPA re-authorized ALB to enter parcels 316 and 318. Due to the difficulty in negotiating the right-of-way, the WAPA construction representative, Daniel Paul, elected not to allow construction of approaches at a private road bisecting the parcel. ALB bases its claim for the additional work incurred as a result of the late right-of-way releases in mile 113/114 on Daniel Paul's direction not to construct approaches across the private road between structures 114/5 and 114/6 because of the problems that WAPA had with the landowner. Testimony revealed that the lack of an approach blocked traffic along the centerline and required all subsequent ALB crews to detour the blocked area. This block affected roads and landing work on July 3 and 4, 1984, groundwire work on July 3, 1984, pole haul work on July 3 and July 5, 1984, ground frame work on July 3, 1984, digging crew work on July 19, 1984 and setting crew work on July 31, 1984.

At the time of the release, the roads and landings crew had their bulldozer just west of the area. Since the bulldozer could not be driven through the access, the equipment had to be loaded and hauled around the parcel. The transport for the bulldozer had to be brought in from Chinook, to haul the dozer, and then return to Savoy. This work performed by the roads and landings crew required an extra ¾ of a day.

According to Ralph Frame's unrefuted testimony and the time cards, the 2 ground framing crews had to skip around the area because of the restricted access and, therefore, incurred 1 extra hour to skip around the site; the ground wire and ground framing operations both incurred 1 additional hour of work in order to go around the site, and the digging and setting crews incurred 1 extra hour to go around the site. The plaintiff's claim also indicates that in the mile 113–114 area, the fence ground crew incurred an additional ½ day of work, and that the staking operation incurred an additional 1.08 crew days of work. Work on the cross-arms, however, was not calculated into the claim, and is not substantiated in the record, according to the testimony of Ralph Frame. Therefore, no recovery is in order for the work on the cross-arms.

## IV Structure Moves

■ In addition to the structure height changes involved in Change Order A001, WAPA ordered ALB to move or change various additional structures during the course of construction at different times throughout the contract. Some of the directions for changes were given orally by WAPA, without written confirmation. In its "Statement of Admission of Liability," the government admits it is liable for structure moves in the amount of $6,503.14. The plaintiff, however, in its "Claims Summary" asserts that the government is liable for $13,446.00 for structure moves.[24]

The joint stipulations state:[25]

In addition to Modification A001, WAPA ordered ALB to move or change various structures including:

| Structure | Date of Written Instruction | Nature of Change |
| --- | --- | --- |
| 157/5, 158/3, 171/6 | | Re-stake structures to provide clearance from gas lines |
| 149/4 | 6/19/84 | Move location and increase pole height |
| 127/7 | 5/7/84 | Move location and increase pole height |
| 80/3 | 8/17/84 | Move structure |
| 79/7 | | Move guy wires |
| 79/6 | 7/19/84 | Move location and increase pole height |
| 76/1 | 7/31/84 | Move structure and increase pole height |
| 58/2 | 8/15/84 | Move structure |
| 9/5, 8/6 | 10/15/84 | Exchange structures to account for flooding |
| 1/8 | | Move structure |
| 1/6 | 10/25/84 | Move structure |

There were 2 structure moves in the Fort Peck area at structures 1/6 and 1/8. According to Ralph Frame, and other evidence presented at trial, the staking operation incurred 30 minutes extra to come back and restake each structure.

Structure 8/6 was originally designated as a dead end structure; however, because of some water ponding in that area, WAPA switched the dead-end structure to structure 9/5. Staking, however, had already been performed at structure 8/6. Therefore, the staking operation had to drive out of Malta, where they were stationed at the time, to restake the structures. Since the dead end structure had anchors, more work was required to restake the structure. Based on the testimony of Ralph Frame, because of the change, the staking operation incurred ½ a day of extra time to do the work.

---

24. Once again, as discussed previously, neither the defendant's "Statement of Admission of Liability" nor the plaintiff's "Claims Summary" indicate whether the $13,446.00 figure includes the $6,503.14 to which the government has admitted liability.

25. Trial testimony offered by Ralph Frame further indicates that ALB was impacted by structure moves in the mile 137 to 138 area. No claim was made for structures at mile 149/3, although it is discussed in connection with mile 149/4. Moreover, although structures 157/8 and 171/1 are not included in the joint stipulation, both sides address them as if to suggest that those structure moves, in fact, did occur, and will be so treated by the court.

Structure 58/2 was also a dead-end structure located in a V-shaped ravine. When the structures were originally staked, the anchors went way down the slope to the bottom of the canyon. As a result, WAPA elected to move the structure a short distance west in order to avoid the problem with the anchors. At this time, the staking crew was working out of Malta. To get to the site, the crew had to come out over the county roads to a trail into the area, do the staking, and then return to Malta by the same route. In addition, because of the steep slopes, the staking was difficult and required an additional 6 hours.

Structure 76/1 was initially staked in the middle of a farm strip in accordance with the contract specifications. At WAPA's request, ALB came back from Malta to restake the structure. Ralph Frame calculated that the crew incurred an additional .38 days to do the restaking work as directed by WAPA. Similarly, structure 79/6, as originally staked in accordance with the specifications, stood directly in front of the doors to a farmer's garage. The property owner asked to have the structure moved in one direction or another. At WAPA's request, ALB restaked the structure, incurring 1 additional hour to do so.

The next structure, 79/7, was an angled structure which went through a chain-linked fence at Malta Auto Supply store. At WAPA's request, ALB added one anchor and restaked the structure. This operation required 1 additional hour of work.

Structure 80/3 was also an angled structure with an angle and guys. At this structure, the guys interfered with irrigation facilities. The structure was not moved, but the guys and anchor arrangement was changed at WAPA's request. The testimony of Ralph Frame presented at trial indicated that the crew took 1 extra hour to do this work.

Structure 127/7 was a dead-end structure just east of and going into the Malta substation. At WAPA's request, ALB changed the staking of the structure and its anchors. This work required an ½ day.

There were between 5 and 7 structures in miles 137 to 138. At the time of the structure change, the ALB staking crew had been working in Malta. Before the structures had been restaked, ALB's ground wire crew had already plowed those structures. The ground wire crew was some distance down line by the time the restaking was complete. ALB had to call the ground wire crew back and redo the ground wire work. According to Ralph Frame, the crew incurred an additional 6 hours to perform the work.

Structures 149/3 (for which no claim was asserted by plaintiff) and structure 149/4 were located just south of Chinook. WAPA moved these structures closer to the highway to ease farming activities for the local landowner. Both structures had been framed before the structure was moved. The ground framing crew had been working east of Harlem and had to return to move the structures. One structure, 149/3, could just be picked up and moved. The pole height on structure 149/4, however, changed. When the structure moves were ordered by WAPA, the pole hauler had been working in the Harlem area at mile 128. The poles he needed for the structure, as changed, were located in Savoy at mile 115. The pole hauler had to go down to Savoy from Harlem, load the poles, go back through Harlem and to Chinook, north of mile 150, then to the structure site. To save some time, the pole hauler stayed and helped the ground framing crews disassemble the first set of poles so that he could pick up the old poles, and then return to Savoy. The pole haul operation took 1 full extra day. The ground frame operation had to come back from the Harlem area to disassemble and reframe the pole. This crew took .69 extra days to do the work. Additionally, the ground wire work at structure 149/4 was performed by another ALB crew. The crew incurred .32 days to do the work. The staking crew returned to structure 149/4 on two different occasions, once from Malta and once from Chinook. The staking operation incurred an additional ½ day to do its work. The digging operation also had to be brought back. This crew incurred ½ day to return to the site, dig the hole, and then go

back to where it had been working. Similarly, the setting crew, which had to bring a crane with them, incurred 1 extra day to come back, set the structure and leave the site.

Structures 157/5, 157/8 and 171/1 were all structure changes related to underground utilities. When ALB staked the structures, it advised Danny Paul, WAPA's construction representative, that the structures, as originally located by WAPA, looked to be too close to the utility lines. After Danny Paul looked at the structure staking, he agreed and asked ALB to restake them. Restaking of the structures occurred on three separate occasions. The restaking operation incurred 6 extra hours of work.

## V. Change Out of Pins to Bolts

Plaintiff's Claim No. 5 addresses WAPA's direction to ALB to change out clevis pins to bolts in the insulation hardware. ALB requests additional compensation for this work, since, according to ALB, WAPA approved the use of pins when ALB initially submitted its drawings, prior to performing the work, and the government issued the directive to change out of the pins to bolts five months after installation had begun.

Pursuant to Contract General Specification, paragraph 3.8.1, on March 27, 1984, ALB submitted shop drawings to the defendant pertaining to the installation of insulator hardware. This submission included drawing number 6018, on plan sheet 41, showing insulator assemblies from the hardware manufacturer depicting hot line type sock clevis pins. The shop drawings were accompanied by ALB's transmittal letter to WAPA's Golden, Colorado, office. The transmittal letter was marked "For approval." On April 23, 1984, WAPA's power branch chief, Alan Lucas, acknowledged receipt of the drawing by letter, and cited one item, not the clevis pin, as not meeting specifications.

Beginning in December 1984 and continuing until May 16, 1985, ALB ordered and installed hardware, including the clevis pins. During this time, WAPA's inspection

contractor, Miner & Miner, continuously inspected ALB's activities along the transmission line. Only on May 16, 1985 did WAPA's inspectors verbally object to the installation of clevis pins instead of hardware that was fastened with a bolt, nut, and cotter key. By letter, dated May 20, 1985, WAPA instructed ALB to furnish and install hardware according to specification paragraph 3.3.2.f, "ASSEMBLY COUPLING HARDWARE" (requiring hardware complete with nuts, locking nuts, bolts, and self-locking stainless steel cotter keys). On June 4, 1985, ALB wrote WAPA a letter stating that WAPA was responsible for the cost of changing out the pins, and advised WAPA that ALB would submit the extra cost figures once they were determined.

Specifications at paragraph 3.3.5 require the contractor to provide and install hardware in accordance with the provided drawings. Paragraph 3.3.2.f, "ASSEMBLY COUPLING HARDWARE," of the General Provisions, Clause No. 2 states in part, "Hardware shall ... be complete with nuts, locking nuts, bolts, and self-locking stainless steel cotter keys." The "SPECIFICATIONS AND DRAWINGS" portion of the General Provisions, Clause No. 15 states in part, "In the case of difference between the drawings and specifications, the specifications shall govern." Moreover, the "SHOP DRAWINGS," state, in part, "Approval by the Contracting Officer shall not relieve the contractor from any errors or omissions in such drawings, nor from responsibility for complying with the requirements of the contract."

The section of the contract entitled "DRAWINGS AND DATA," paragraph 3.8.1 of the specifications, states in part:

As soon as practicable after award of contract, the contractor shall furnish to the Western Area Power Administration ... for information, ... three sets of drawings showing the complete insulation and overhead ground wire assemblies....

The General Provisions, Clause No. 10, "INSPECTION AND ACCEPTANCE," states in part:

a. ... Any such (Government) inspection or test is for the sole benefit of the Government and shall not relieve the contractor of the responsibility of providing quality control measures to assure that the work strictly complies with the contract requirements. No inspection or test by the Government shall be construed as constituting or implying acceptance....

b. The Contractor shall, without charge, replace any material or correct any workmanship found by the Government not to conform to the contract requirements....

* * * * * *

General Provisions, Clause No. 45, "GOVERNMENT INSPECTORS," states in part:

No inspector is authorized to change any provision of the specifications without written authorization of the Contracting Officer, nor shall the presence or absence of an inspector relieve the Contractor from any requirements of the contract.

Finally, General Provisions, Clause No. 50, "CONTRACTOR INSPECTION SYSTEM," states in part:

The contractor shall (1) maintain an adequate inspection system and perform such inspections as will assure the work performed under the contract conforms to the contract requirements....

The interpretation of a government contract is a matter of law, *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 386, 351 F.2d 972, 973 (1965), and the language of the contract must be given the meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Id.,* 169 Ct.Cl. at 388, 351 F.2d at 975.

When interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983). Moreover, in addition, the words in the contract should be given their ordinary meaning.

*Tilley Constructors & Engrs., Inc. v. United States,* 15 Cl.Ct. 559, 563 (1988); *see ITT Arctic Servs., Inc. v. United States,* 207 Ct.Cl. 743, 752, 524 F.2d 680, 684 (1975).

In the instant case, the language of paragraph 3.3.2.f of the contract specifically states that:

Hardware shall ... be complete with nuts, locking nuts, bolts, and self-locking stainless steel cotter keys.

The contract is very clear that all hardware requires nuts, bolts, and cotter keys. There is no mention of pins as a substitute for these requirements. Moreover, the general provisions of the contract state, that in the event of a difference between the drawings and the specifications, the specifications shall govern. Whether or not a government representative, not the contracting officer, who may have been on-site, tacitly approved on-going operations, including installation of hardware not specified in the contract, is irrelevant to the outcome of plaintiff's claims in this regard. Based on the court's interpretation of the contract, in accordance with established case law, and after reviewing the facts presented, ALB's claim for damages associated with the change out of pins to bolts must be denied.

VI. Guy Wire Spacers

ALB's Claim No. 6, guy wire spacers, requests additional compensation for installing guy wire spacers at WAPA's request. Section 3.2.1 of the specifications requires the contractor to furnish the hardware for attachment of the guy wires to the guy anchors. Drawing no. 6047, included in the contract specifications, depicts several details of acceptable guy wire assemblies. The drawing, however, does not specify the particular type of guy terminator. No guy wire spacers were shown in the plans or specifications. On November 13, 1984, a WAPA inspector reported that a problem was encountered with the rubbing together of a soft aluminum surface and hard steel surface. The government determined that the rubbing together of soft aluminum and hard steel would

cause excessive wear and failure. WAPA directed ALB to solve the problem. After consulting with, and obtaining the approval from WAPA, ALB had a local manufacturer produce wooden block spacers. On July 16, 1985, ALB began assembly and installation of wooden blocks between the wires to prevent rubbing.

Shortly after trial, the parties agreed to settle the guy wire spacers claim. The settlement is reflected in a letter from defendant's counsel, Sheryl Floyd, to ALB's attorney, Stephen L. Nourse, a copy of which was provided to the court. The letter states in pertinent part:

> This letter is to inform you that plaintiff's offer to settle Claim 6 in this case, in the amount of $2,030.86 plus interest from December 1986, has been accepted on behalf of the Attorney General of the United States.

The settlement envisioned that plaintiff would be paid $2,030.86 for the claim. Apparently, however, no payment has been made to plaintiff as of this date, this amount, therefore, should be included in the final award made to plaintiff pursuant to this Opinion.

VII. Stringing

 Plaintiff's stringing claim seeks to recover additional costs for the delay in its ability to commence stringing operations on schedule, due to WAPA's formally ordered changes to the structure heights included in Change Order A001, as well as the other directed structure height changes, the increase in the number of cultural sites, the problems between WAPA and Montana Power concerning the Harlem Substation, and the late or unobtained rights-of-way and access roads. As a result, ALB had to perform stringing during the winter months, which was contrary to its originally approved schedule.

It is clear from the record that under the "as planned" schedule ALB originally contemplated beginning its stringing operation at the Havre substation in July 1984, reaching the Harlem substation in October or November 1984, having that crew do removal operations through January 1985,

and then shutting down until resuming stringing in March 1985. The bar graph schedule submitted by ALB to WAPA was approved by the defendant on March 28, 1984 showed a mid-July starting date for the stringing operations. After the February 15, 1984, preconstruction meeting, David Frame moved back the stringing start date to mid-September 1984, in response to information he had received from WAPA's Danny Paul that there were right-of-way and cultural site problems which had not been raised at the February meeting. Danny Paul had indicated that cultural resource site restrictions would be more severe than stated in the specifications, and that some sites would not be ready by the time ALB anticipated beginning its stringing. COTR Jones approved the second bar graph schedule, submitted by ALB to WAPA in March 1984, with the revised start date. ALB's again revised schedule of May 18, 1984, showed ALB pushing back its stringing start-up date to mid-September 1984. Then, in the June 16, 1984 schedule, ALB moved the stringing start date still further back, to October 1984.

As a result of the aforementioned delays to the schedule, ALB's stringing operation began at the end of October, 1984, and ALB was forced to string through the winter months, which caused delays because of cold and wind, frozen ground, which forced the workers to bundle up in heavy clothing, and snow, all of which resulted in slower work capability. As Walter Terry, ALB's expert witness, testified, winter stringing costs are "clearly" greater.

It is well established that the plaintiff cannot recover for delay caused by the government when that delay is concurrent with another delay which is not caused by the government. *See Broome Constr. Inc. v. United States*, 203 Ct.Cl. 521, 528, 492 F.2d 829, 833 (1974); *Commerce Int'l Co. v. United States*, 167 Ct.Cl. 529, 543, 338 F.2d 81, 85–86 (1964). In the case at bar, the defendant suggests that ALB's decision to remove stringing equipment from the WAPA site to another location, pending availability of the WAPA site for stringing, is a concurrent delay. The court is unper-

suaded that the re-mobilization of the stringing equipment by plaintiff contributed to the delays in the stringing operation. Therefore, the plaintiff should be allowed to recover for its reasonable, additional costs incurred in the stringing operation.

According to the testimony of Ralph Frame:

I calculated the costs for the period from November 4, 1984 through March 31, 1985. That was during the period on the winter work period. I calculated that cost and what is [sic] cost us per mile to do the stringing operation in that. That is what we are calling an affected area for that period of time during the winter.

Then I calculated the costs in an unaffected area which would be then [sic] the costs that occurred just prior to. that actually from September 30 to November 4th. Up to that period. Then I also calculated the costs from after March 31, through May 19, 1985. Then again from July 16 to September 22, 1985. That was the area that I described awhile ago on the board as being unaffected and calculated the cost per mile.

So then comparing those—I did that for both equipment I did that for the labor costs. Then we have a cost per mile in an affected area, and we also have a cost that it took per mile to do that stringing in the unaffected area.

There was 61.14 miles in the affected area. So I took the difference of those costs and simply multiplied it times 61 miles. In other words let's say that affected area had $10 worth of cost per unit or per mile, and the unaffected area had $5. Subtract one from the other and it gives you the extra cost per mile. Then you just simply make that multiplication.

Q. It wasn't quite that dramatic a difference though was it?

A. No. That was for an example. I'll go through this. For example in affected areas those costs labor was $3,281 per mile. For the unaffected area those costs were $2,284 approximately a 1000 miles, a $1,000 a mile difference.

Q. Did you go through that same exercise for all three activities? The stringing, the clipping, the dead ending?

A. I did. The period changes for the costs because those activities don't all start at the same time. Then one of the activities are out and they don't all finish at the same time. So I needed to go through that exercise for clipping, dead ending, and the stringing so I could get the costs separated that way.

Q. Then those costs you added your field support which again, was at 38% rather than 50% at this time period. Is that correct?

A. That's correct.

Q. The total of the stringing claim then is $194,000, which includes 10% profit. Is that right, sir?

A. Yes, that is correct.

The court recognizes that Ralph Frame has been in the relevant business for many years, that the stringing crew employed by ALB on the instant project was experienced and, in fact, had come directly from the Bonneville Power Administration project, on which the crew had strung exactly the same type of conductor on wood poles, using the same equipment. Therefore, based on the facts and law, the court finds that the plaintiff is to recover the amount claimed for its winter stringing operation, in accordance with the time frames established by Ralph Frame's testimony.

VIII. Davis–Bacon Act Claim

■ The Davis–Bacon claim results from WAPA's "request" that ALB reclassify certain of its employees, pursuant to 40 U.S.C. §§ 276a–276a–7. ALB objected to WAPA's direction, but after several progress payments were withheld, ALB made the reclassifications under protest. Plaintiff's claim actually involves two disputed classifications. The first reclassification requested by WAPA was for ALB employee, Mike Bader, from groundman to mechanic. The second reclassification request is more general in nature, and involves WAPA's request that ALB include a lineman in its ground frame and setting crew. Since the parties have stipulated to the

dates involved, as well as to the Department of Labor wage rates applicable under the Davis–Bacon Act for the positions at issue, the court need only make a factual determination as to the appropriateness of the requested reclassifications at issue.

By letter, dated May 4, 1984, from COTR Robert H. Jones to ALB, WAPA notified plaintiff that government labor checks of ALB's operations had indicated that Mike Bader, an employee classified by ALB as a groundman, should be reclassified as a mechanic. WAPA requested ALB to correct the problem and to submit corrected payrolls as soon as possible. The May 4, 1984, WAPA letter to ALB stated in part:

Upon review of your payrolls submitted to this office, the following discrepancies were noted:

*Payroll No. 4—Week ending March 24, 1984:*

Mike Bader—Should be classified and paid as mechanic in lieu of groundman.

*Payroll No. 5—Week ending March 31, 1984:*

Mike Bader—Should be classified and paid as mechanic.

*Payroll No. 6—Week ending April 7, 1984:*

Mike Bader—Should be classified and paid as mechanic.

*Payroll No. 7—Week ending April 14, 1984:*

Mike Bader—Should be classified and paid as mechanic.

*Payroll No. 8—Week ending April 21, 1984:*

Mike Bader—Should be classified and paid as mechanic.

Please review these discrepancies and submit corrected payrolls to this office as soon as possible.

By letter dated May 18, 1984, WAPA informed ALB that it believed that the proper make-up of the ground framing and setting crews should include a lineman and line equipment operator. WAPA requested ALB to correct its failure to include a lineman in its framing and erection crews, WAPA stated that if the problem was not corrected, an amount equal to the amount owed to each employee would be withheld from forthcoming progress payments. In fact, monies were withheld from the contractor. The May 18, 1984, WAPA letter to ALB stated:

This office believes the following classifications represent the proper makeup of the respective crews:

| Framing Crew | Erection Crew |
| --- | --- |
| Lineman (1) | Lineman (1) |
| Line Equipment Operator (1) | Line Equipment Operator (1) |
| Groundman | Groundman |

We therefore, request your firm classify and pay, in accordance with the subject contract wage decision, the affected employees.

The payrolls requiring corrections in regard to the above matter are as follows:

No. 4, week ending March 24, 1984—framing crew

No. 5, week ending March 31, 1984—framing crew

No. 6, week ending April 7, 1984—framing crew

No. 7, week ending April 14, 1984—framing crew

No. 8, week ending April 21, 1984—framing and erection crew

The plaintiff argues that Mike Bader, who performed his tasks without the tools or training of a mechanic, was properly classified as a groundman. WAPA, on the other hand, argues that Mike Bader did more than grease equipment, gas up vehicles, and clean up the shop area, and that he also installed vehicle parts, welded vehicle equipment, and repaired vehicles.

The contract documents, including the amendments, do not appear to direct the contractor as to crew make-up. General Provisions, Clause No. 29 of the contract regarding the Davis–Bacon Act (40 U.S.C. 276a to 276a–7), states in relevant part:

\* \* \* \* \* \*

Such laborers and mechanics shall be paid the appropriate wage rate and fringe benefits on the wage determination for the classification of work actually performed, without regard to skill except as provided in clause entitled 'Ap-

prentices & Trainees.' Laborers or mechanics performing work in more than one classification may be compensated at the rate specified for each classification for the time actually worked therein: Provided, That the employer's payroll records accurately set forth the time spent in each classification in which work is performed. The wage determination (including any additional classification and wage rates conformed under paragraph (b) of this clause) and the Davis–Bacon poster (WH–1321) shall be posted at all times by the Contractor and its subcontractors at the site of the work in a prominent and accessible place where it can be easily seen by the workers.

\* \* \* \* \* \*

General Provisions, Clause No. 34, "WITHHOLDING," states in part:

The Contracting Officer shall upon his/her own action ... withhold or cause to be withheld from the contractor under this contract ... so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics ... the full amount of wages required by the contract....

Webster's Third New International Dictionary, p. 1003 (unabridged 1976) defines a groundman as:

A member of a work crew who performs the tasks that can be done on or from the ground: as a: one who digs holes and raises poles for electric power or telephone lines and lifts equipment and tools to linemen.

A mechanic is defined as:

Manual labor or employment ... a manual worker ... a man skilled in the construction or operation of machines or vehicles run by machines.... 1400–1401.

Webster's Third International Dictionary, pp. 1400–01 (unabridged 1976).

Initially, it is interesting to note that Mike Bader, himself, filled out some of his time cards by classifying himself as a mechanic. The testimony at trial also indicates that although ALB may have hired Mike Bader as a groundman, and that he did perform some groundman duties, he worked as an oiler/serviceman cleaning up pickup trucks, doing service work on equipment, pumping gas, greasing equipment, and cleaning the shop. The record also shows, however, that Mike Bader fixed equipment by installing equipment on vehicles, including the installation of fuel tanks and wire pumps, fixed fuel pumps, fixed fuel systems, and welded vehicle parts.

Based on the evidence presented, the court finds that Mike Bader was largely performing the work of a mechanic, rather than that of a groundman. The court, therefore, finds that WAPA properly directed that Mike Bader should be reclassified as a mechanic.

■ The second aspect of the Davis–Bacon Act claim is WAPA's requirement of ALB that the framing crew include one lineman, one line equipment operator, and one groundman; and that the setting crew include one lineman, one line equipment operator, and one groundman. ALB argues, citing to the testimony of David Frame, that it is not the prevailing practice in the industry in the Montana area to include a lineman on a ground frame or setting crew. Every groundman, whether on the ground frame or on the setting crew has to tighten bolts on the ground. Groundmen and linemen use the same tools for the tasks, except that linemen also have climbing gear, which consists of climbing hooks and a climbing belt and are skilled at climbing poles, since much of their work is done in the air. David Frame also stated that all the workmen on the ground frame or setting crew were doing "the same work, identical work." Warren Sorenson, ALB's project supervisor, stated that in his 30–year experience in the transmission line construction industry, he has never had a lineman on either a ground framing or a setting crew. A lineman is generally an individual who is able to climb a pole, and there is no need for those skills in ground framing or setting. Walter Terry, ALB's expert witness, testified convincingly that in his experience it is not the prevailing practice to have a lineman on a ground frame or setting crew.

The defendant, on the other hand, argues that the proper composition of both the framing and setting crew should include a lineman. In support, the defendant relies on the testimony of John Harris, who testified that the prevailing practice in the area was to require one lineman per crew.

The court is persuaded by Warren Sorenson's testimony that all the workmen on the ground framing crew performed the same tasks. It does not seem reasonable under the circumstances to require plaintiff to reclassify an employee to meet an apparent classification standard which defendant has not shown must include a lineman. At best, defendant has offered evidence by analogy, in the testimony of John Harris, who referred to the union agreement between Western Line Constructors and the International Brotherhood of Electrical Workers, which followed defendant's preferred classification scheme. Therefore, the court finds that the plaintiff should prevail with regard to WAPA's direction to ALB to reclassify and include linemen in the framing and erection crews.

IX. Removal of Transmission Line

■ The removal claim relates to the extra costs ALB incurred in its removal operations as a result of WAPA's actions. In ALB's approved "as-planned" schedule, it is clear that ALB planned to begin removal of the old wire from Havre back towards the Harlem substation, beginning in October or November of 1984, and to complete removal operations to Harlem in January, 1985. The schedule shows ALB removing the line between Malta and Richardson Coulee starting at Malta in early August, 1985, continuing removal to the Richardson substation through the end of August, 1985, and completing removal operations in mid to late October 1985.

The contract specifications, section 2.1, Removing Transmission Line, provides as follows:

2.1.1 REMOVING EXISTING 161–KILOVOLT TRANSMISSION LINE:

The item of the Schedule entitled 'Removing existing transmission line' includes removing all conductor, complete with all accessories, and wood pole structures, including guys and anchors, and performing backfill and necessary grading at structure sites. Time schedule for commencing removal of the existing transmission line is provided for under the 'Commencement, Prosecution, and Completion of Work' paragraph.

The contractor shall submit for approval a detailed plan for removal of the existing transmission line. The plan shall include the method and proposed safety precautions for at least the following:

a. Removing the conductor in parallel to the existing 69kV system, hot line crossings, and road crossings.

b. Releasing the tension on the conductor to prevent structural failure.

c. Crossarm, pole and anchor removal.

d. Traffic control for U.S. Highway No. 2.

A large portion of the existing transmission line is in either irrigated or dryland fields. No equipment will be allowed in any field with a growing crop.

The existing line was constructed in 1934–1935 and is wood pole, H-framed with three conductors and without overhead ground wire.

For information, the following list gives approximate quantities of materials which shall be removed. The contractor shall determine actual quantities and regardless of the quantities removed, payment will only be made for the lump sum price bid in the schedule.

| | |
|---|---|
| Two–Pole Structures .... | 1,521 |
| Three–Pole Structures... | 121 |
| Six–Pole Structures ..... with Switches | 2 |
| Single Guys ........... | 746 |
| Double Guys .......... | 270 |
| Single Anchors ........ | 640 |
| Double Anchors ....... | 125 |
| 300–Kcmil Copper....... Conductor | 39.5 miles |
| 477–Kcmil ACSR ....... | 149.1 miles |

The existing poles and guy anchors may be completely removed or cutoff 24 inches below ground surface in grassland and 36 inches below ground surface in cropland.

In the Bowdoin National Wildlife Refuge, line removal will not be allowed during May and June. The Refuge management prefers that line removal be accomplished July through September or November through February.

Fifty of the newer undamaged crossarms removed from the old line as designated by the Authorized Representative shall be delivered to the Ft. Peck District Office.

The contractor is advised that the wood poles were treated with a 10 percent solution of pentachlorophenol in 1965. Disposal of wood poles shall be in accordance with all State, Federal, and local laws and regulations. If the poles are placed on sale, the contractor shall inform prospective buyers of the chemical treatment.

None of the materials removed from the transmission line may be used for construction of the new transmission line. All material removed from the transmission line shall become the property of the contractor and disposal of such materials shall be made off the right-of-way.

All holes resulting from the removal operations shall be backfilled and the backfill shall be compacted. Additional material required for backfill shall be obtained by the contractor from any approved source. The backfill material in the top 8 inches of the holes shall be suitable for existing land users. Earth material that is loosened during the removal operation shall be compacted. All backfill shall be compacted to a dry density not less than the natural in-place dry density.

In addition, contract provision paragraph 1.1.3, "COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK," restricts removal operations and, in pertinent part, provides:

 d. OUTAGES

 \* \* \* \* \* \*

An extended outage will be allowed for construction of the segment between the new Richardson Coulee Substation and Fort Peck Switchyard since the new line will be constructed on about 4½ of the same right-of-way presently utilized by the old line. The outage will be limited to 30 days and shall be scheduled between April 1 to July 15 or September 15 to November 15.

Montana Power Company plans on energizing the existing 161–kV Transmission Line from Malta Substation to the existing Richardson Coulee Substation at 69–kV to continue serving customer loads while they are moving equipment from the existing substation to the new Richardson Coulee Substation. It is estimated that the time period involved will be from September 15, 1985, to October 15, 1985. Therefore, removal of the existing 161–kV Transmission Line between Malta and the existing Richardson Coulee Substation cannot commence until after October 15, 1985.

 \* \* \* \* \* \*

The court is persuaded that, based on a comparison of the events and the "as-planned" schedule, ALB's removal operation was delayed until June 1985, as a result of Change Order A001 and other government actions, such as late or restricted access to necessary roads and cultural resource sites, and was not due to acts on the part of the plaintiff. As is discussed more fully above, the court finds that the rippling effects of Change Order A001, the late release of cultural resource site restrictions and access roads, and the other structure changes made following A001, caused delays in ALB's stringing operation, which, in turn, had an impact on the "as planned" removal schedule. The delays ALB experienced in the stringing operation impacted the removal operations because the new transmission line had to be completed from Havre to Harlem and connected to the Harlem substation before the old line could be de-energized and removed. In addition, ALB's removal operations were impeded by WAPA's failure to complete work at the Harlem substation, which was necessary to allow ALB's stringing operation to tie into the substation. This inability to string into the Harlem substation as planned, resulted in ALB not being able to start its removal work until

after ALB had strung into the Malta substation, out of sequence.

Compounding the Harlem substation problem, in mid-April, 1985, WAPA discovered a phasing problem on the project. At a meeting on April 17, 1985, COTR Jones informed ALB that it might be required to install a transportation structure between some or all of the substations, and that until the phasing design problem was corrected by WAPA, ALB would not be able to complete the approach spans into either the Havre or Harlem substations. In addition, during the same time period, WAPA contacted Montana Power Company concerning Montana Power attaching to the line which ALB was to build. There was a conflict in the bypass Montana Power proposed because the bypass did not provide adequate clearances.

The phasing problem required corrective work at the Richardson Coulee substation as well as at the Havre substation, in addition to the Harlem substation. Around May 7, 1985, WAPA and Montana Power were still involved in discussions regarding the correction of the phasing problem on the transmission line. The phasing plan and necessary changes had to be accomplished before the new line could be energized. This further delayed the removal operations until the beginning of June, 1985.

To assess the damages for the removal operation, Ralph Frame used an affected/unaffected analysis to determine the damages associated with the removal claim. Initially, Ralph Frame determined that, because of restrictions on crossing certain agricultural land areas when crops were growing, and since ALB's removal operation actually occurred in the summer, the removal production rates slowed down because of growing crops and irrigated lands, particularly between Harlem and Havre. ALB's progress in that section, therefore, was less than could have been achieved if ALB had performed the removal operation in the fall and winter when there would not have been the disruptions

from agricultural activities. The affected area between Havre and Harlem was approximately 50 miles. Ralph Frame did a comparison between the cost in the affected area against the cost in the unaffected area. The unaffected area used for the comparison was the portion of work done during the fall period of the year, beginning about October 1, 1985 between Malta and Fort Peck. Ralph Frame did not use the area between Malta and Harlem in his calculations because there were agricultural lands involved in that section and the work had been performed as planned during the summer when, as expected, the costs were higher. Ralph Frame also compared the ground conditions, terrain and other factors between the affected and unaffected area selected, and found that they were roughly the same. In the affected area, most of the agricultural land was encountered between Zurich and a few miles west of Havre. The unaffected area, which was along the Milk River Valley, was flat and there was not much difference in the terrain between the two areas. To determine the cost, Ralph Frame compared the actual costs of removing the section from Havre to Harlem, and used the same method to determine the costs in the unaffected area. Plaintiffs broke down their additional costs for this portion of the work on page 121 of Joint Exhibit 13, "ALB Claim for Additional Compensation," for a total of $151,606.34.

## X. Re-mobilization [26]

█ Under the re-mobilization claim, the plaintiff argues that WAPA's structural height changes caused delays to ALB's stringing schedule. The re-mobilization claim involves the costs associated with ALB's decision to remove some of its equipment from the Fort Peck–Havre contract site to another ALB project in California, as a result of Change Order A001. At the time of bid submission on the instant contract, ALB anticipated using its own equipment and leasing some equipment for the stringing portion of its work on the

---

**26.** The parties have referred to this claim as both the re-mobilization and the mobilization

claim. For the sake of simplicity, the court will use the term re-mobilization in this Opinion.

WAPA project. Between January through July 1984, ALB had purchased equipment, including stringing equipment, pickups and diggers, some of which could be used on more than one type of operation. ALB began mobilizing equipment to the contract site in February 1984. By May 1984, ALB had mobilized stringing equipment, including a sagging machine, several diggers, pickups, lowboys and floats, wire trailers, and wire tensioners to the site.

After WAPA issued Change Order A001, COTR Jones advised ALB of the cultural sites problems, the pole supplier advised ALB that it was unable to determine exactly when it could start getting the increased pole heights up to the site. There also were questions as to when the Harlem substation would be ready, and when the two rights-of-way would be released east of Harlem. It became evident to David Frame that Change Order A001 and the other problems would delay ALB's work progress. Moreover, David Frame was concerned about ALB's ability to start stringing wire on schedule. The stringing equipment ALB intended to use for the WAPA project was in three locations at this time. Some of the equipment had already been moved to the WAPA project; some equipment was in transit to the project site; and some equipment was at a location in Colorado, where ALB had just purchased substantial additional amounts of stringing equipment.

Not knowing exactly how the problems were going to be resolved, David Frame talked with his managers throughout the company to see if he could reposition the equipment to best utilize the equipment and mitigate the impact of Change Order A001 and the other delays on the WAPA project, as well as on other jobs in which the plaintiff was involved.

Before the problems arose on the WAPA project, ALB had intended to use some of its own equipment, as well as leased equipment for two other on-going projects in California. When it became apparent to David Frame that ALB definitely would be delayed at the WAPA site, he decided to take the stringing equipment, which already was at the WAPA site, enroute to the WAPA site or scheduled to come to the WAPA site, and transfer it over to one of ALB's other California projects.

The court has thoroughly reviewed the exhibit in the record which describes the costs for demobilizing, then re-mobilizing the equipment from the Chinook WAPA site, from Colorado, down to ALB's other project in California, and then back to the WAPA project site. In arriving at the dollar figure for the claim, Ralph Frame deducted from this claim the mileage it would have taken to move the equipment from Colorado directly to Chinook, instead of going via California. In so doing, Ralph Frame arrived at the $2.50 per mile cost, one way figure, by checking with ALB's home office personnel who arranged for the hauling. ALB had independent trucking outfits move the equipment, so this cost was an actual out-of-pocket cost.

Despite the government induced delay, ALB had the option of keeping the equipment at the WAPA site until stringing operations could begin. ALB chose on its own, however, to relocate some of the equipment to other ALB sites. At trial, Walter Terry, ALB's expert witness, testified that in his view ALB took the cheapest alternative available to it under the circumstances. Nevertheless, the court views the plaintiff's decision to relocate equipment as its own business decision, taken for its own reasons and to its own account. The equipment which was moved appears to have been moved to one or two other ALB job sites, quite some distance away from, and unrelated to, the government contract at issue. It is possible that by moving the equipment, ALB saved itself significant costs, but plaintiff's reliance on a theory that the movement of the equipment was done as a mitigation of damages in the instant case is misplaced. Whether, as defendant suggests, by moving the stringing equipment to California for use on another ALB project, plaintiff saved the anticipated costs on the other project of moving the equipment from the instant contract to that contract, or saved the cost of renting additional equipment, is irrelevant. Their motive not withstanding, ALB should not be

allowed to charge the defendant for costs which could also be attributable to an unrelated contract job. Plaintiff is not entitled to recover for the re-mobilization costs as claimed.

## XI. Extended Home Office Overhead

■ With respect to this claim, the plaintiff is seeking damages in the form of increased overhead costs for obtaining and maintaining insurance and bonding, purchasing materials, paying vendors, invoices, processing accounts payable, maintaining payroll, preparing certified payroll documents, coordinating with suppliers, coordinating equipment and personnel, and doing the bidding and estimating work. Plaintiff claims it would not have encountered these costs, but for delays resulting from Change Order A001, untimely releases of right-of-ways and access roads, and additional cultural site restrictions.

Home office overhead "on a daily basis allocable to the period of the overrun for which the government is responsible" is a well recognized item cognizable as a damage for delay. *Luria Brothers & Co. v. United States*, 177 Ct.Cl. 676, 691, 369 F.2d 701, 709–10 (1966) (citing *J.D. Hedin Constr. Co. v. United States*, 171 Ct.Cl. 70, 347 F.2d 235 (1955)); *see also Capital Electric Co. v. United States*, 729 F.2d 743, 746–47 (Fed.Cir.1984).

The frequently employed "Eichleay formula," named for the decision in which it was adopted, *Eichleay Corp.*, ASBCA 60–2 BCA ¶ 2688, 135651, *reh'g denied*, 61–1 BCA 2894 (1980), consists of the following three steps:

1. $\dfrac{\text{Contract billings}}{\text{Total billings for contract period}}$ $\times$ $\begin{array}{l}\text{Total overhead}\\ \text{for contract}\\ \text{period}\end{array}$ $=$ $\begin{array}{l}\text{Overhead allocable}\\ \text{to the contract}\end{array}$

2. $\dfrac{\text{Allocable overhead}}{\text{Days of performance}}$ $=$ $\begin{array}{l}\text{Overhead allocable}\\ \text{to contract per day}\end{array}$

3. Daily contract overhead $\times$ Number of days delay $=$ Amounts recoverable

---

*See Capital Electric Co.*, 729 F.2d at 747; John Cibinic & Ralph Nash, *Administration of Government Contracts* 505, and *see also Luria Brothers & Co. v. United States*, 177 Ct.Cl. 676, 369 F.2d 701, which utilized a slightly different version of the same formula.

Plaintiff in the instant case should be entitled to recover for extended home office overhead costs, in accordance with the *Eichleay* formula.

## XII. Retightening Hardware

■ Plaintiff's retightening hardware claim requests additional compensation for the retightening of hardware at WAPA's direction. The hardware at issue in this claim consists of the bolts, which hold the cross-arm and cross-braces on the bands on top of the poles, and the brackets, which hold the insulators to the cross-arms and bolts and which go through the wood products and tighten onto the metal products.

In the case at bar, there is no doubt that the retightening of the hardware was not contemplated in the contract as executed. Specifications, paragraph 3.2.2.a.(4), "WOOD POLES," references Federal Specification TT–W–571 for treatment of wood poles. TT–W–571 lists several species of wood poles and several methods of treatment for each species. Of the acceptable methods listed, ALB selected the waterborne preservative method. ALB's subcontractor, Taylor Lumber, treated all the poles supplied with ACA (Chemonite). Furthermore, specifications, paragraph 3.2.4.a., "CONSTRUCTING WOODPOLE STRUCTURES," states in part: "All nuts

and locknuts used in the structures shall be tightened adequately but not excessively."

The facts of the case indicate that the pressure treating procedure used by ALB was one of the acceptable methods and that the poles were inspected before and after pressure treating by Bode Inspection Agency, an independent inspector. They inspected and approved the poles both for penetration and amount of preservative used. In addition, WAPA admits Taylor Lumber properly treated the poles with the waterborne preservative called for in the contract specifications, as one of the preservatives which could be used on the poles. The facts indicate also that ALB tightened hardware on an as needed basis during its stringing operation. Moreover, WAPA admits that ALB properly tightened all the hardware in accordance with the specifications the first time it had gone through the work. WAPA does not allege that ALB or Taylor Lumber did anything improperly or contrary to the specifications which resulted in pole shrinkage. Based on the aforementioned evidence, the court is convinced that the poles were properly treated, and that ALB originally tightened the hardware in accordance with the contract specifications.

Next, the court must determine if the government ordered the additional work or was in any way at fault. The facts reveal that in February 1985, ALB had a meeting with WAPA and, at the meeting, COTR Jones asked Walter Sorenson to give WAPA a price for tightening up loose hardware, which had been discovered by the inspectors. In response to Mr. Jones' request, on February 22, 1985, ALB submitted a price of $38 per structure to retighten the hardware. ALB then received a letter from WAPA telling it that ALB had the responsibility to retighten the hardware. In pertinent part, the letter stated:

As per your request during our meeting of February 19, 1985; we are submitting the following price quotation for tightening of hardware attached to the poles.... $38.00 per structure.

Please issue a contract change order for this work.

On the same date, February 22, 1985, COTR Jones transmitted a letter to ALB stating in part:

Prior to installing the new transmission line at Havre, Harlem, and Malta substations and energizing the individual segments of the transmission line, all aerial clean-up must be completed. In addition, during our review of the first thirty miles of transmission line, we have noticed considerable shrinkage of the poles. Therefore, under paragraph 12 of the General Provisions (page 88 of 142) it is your responsibility to check and retighten, if necessary, all nuts and locknuts used in the structures.

ALB subsequently checked and retightened all nuts and locknuts under protest. A number of causes which could have accounted for the loosening of the hardware are described in the trial record. For example, COTR Jones testified that the poles could have shrunk due to the use of the water born preservative, specified for by the contract, but also by the exceedingly dry year in 1984, which would have caused the moisture to migrate out of the poles faster than normal.

The contract called for the nuts and locknuts to be tightened adequately prior to delivery on the project. The loosening of the nuts and locknuts would appear to be a risk of the type of work which should be borne by the contractor. It was not proximately caused by the defendant's delays or defective contract specifications. Plaintiff should not be allowed to recover for retightening of the hardware as claimed.

## CONCLUSION

The court hereby GRANTS in part, and DENIES in part, plaintiff's claim for an equitable adjustment to the contract price. The court finds that certain items of work performed by the plaintiff were outside the scope of the contract and were covered under the Changes clause of the contract. Those items of work are the structure height changes included in Change Order A001 and those subsequent structure height changes ordered by WAPA; late or restricted access to cultural sites; right-of-

way releases and access roads; stringing, clipping, and dead-ending; and extended home office overhead. The plaintiff is also entitled to a partial recovery for the Davis–Bacon Act reclassifications. The plaintiff is not entitled to recovery for the claims related to change out of pins to bolts; one of the two reclassification claims under the Davis–Bacon Act; re-mobilization and re-tightening hardware. Finally, the parties have indicated that they have reached a settlement on the guy wire spacer issue. Recovery, therefore, should be recalculated in accordance with this Opinion.

As discussed more fully above, the court is persuaded that the "jury" or "total cost" method of calculating damages is appropriately invoked in this case. In reaching this conclusion, the court observes that it did so in light of the complexity of the issues, the less than clear presentations of the parties, both at trial, as well as in the post-trial filings, and the sheer volume of the material concerning hundreds of miles of transmission line, numerous employees, and a contract that spanned a period of years. The court is persuaded that plaintiff is entitled to recover based on the specifications, including the plan and profile, given to ALB by WAPA as part of the prebid solicitation documents, and plaintiff's reliance on those documents. However, the plaintiff should not be allowed to recover for time to perform operations which were calculated as part of the actual time of performance in plaintiff's bid on the contract, unless the performance was duplicative because of the need to redo an operation as a result of a directed or constructive change to the contract.

The parties are to meet together for the purposes of resolving the damages due in the instant law suit based on the findings of fact and conclusions of law included in this Opinion. In their discussions, the parties are to establish whether or not the plaintiff has been compensated for the guy wire spacer claim, which has apparently been settled. The parties also are advised to address whether or not the plaintiff has been compensated for those other amounts for which defendant has admitted liability, an issue not clearly addressed by either

party during this proceeding. On or before October 15, 1992, the parties shall file a joint status report with the court detailing the progress of their discussions. By separate order, the court will set a subsequent status conference to bring this case to final resolution.

IT IS SO ORDERED.